**UNITED STATES of America, Appellee,**

v.

**Maryland HALL, Defendant-Appellant.**

**No. 1190, Docket 84–1016.**

United States Court of Appeals,
Second Circuit.

Argued May 8, 1984.

Decided July 17, 1984.

---

Phylis Skloot Bamberger, New York City (The Legal Aid Society Federal Defender Services Unit, New York City, of counsel), for defendant-appellant.

Lawrence S. Robbins, Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Mary McGowan Davis, Brooklyn, N.Y., of counsel), for appellee.

Before FEINBERG, Chief Judge, WINTER, Circuit Judge, and LASKER, District Judge.*

WINTER, Circuit Judge:

Maryland Hall appeals from a judgment entered after her conviction by a jury of wrongful conversion of property which came into her possession while she was acting as a United States Customs Inspector, in violation of 18 U.S.C. § 654 (1982).[1] Judge Bramwell sentenced Hall to a split sentence including six months in prison, five years probation, and to make restitution pursuant to 18 U.S.C. § 3579 (1982). We affirm.

## BACKGROUND

Appellant was at all relevant times employed as a United States Customs Inspector. Her tasks involved processing passengers arriving on international flights at the John F. Kennedy International Airport ("JFK") by checking their passports, reviewing customs declarations, seeing that currency forms were filled out, and searching baggage.

On October 25, 1982, Mrs. Rashica Haraba arrived at JFK with her daughter and two grandchildren on a flight from Damascus, Syria. Mrs. Haraba had with her a

---

* Hon. Morris E. Lasker of the United States District Court for the Southern District of New York, sitting by designation.

1. The relevant portion of 18 U.S.C. § 654 reads as follows:

Whoever, being an officer or employee of the United States or of any department or agency thereof, embezzles or wrongfully converts to his own use the money or property of another which comes into his possession or under his control in the execution of such office or employment, or under color or claim of authority as such officer or employee, shall be fined not more than the value of the money and property thus embezzled or converted, or imprisoned not more than ten years, or both.

large suitcase, a box containing food, and a pocketbook containing ten $100 bills and one hundred $20 bills. She had counted her money immediately before leaving the plane. Since Mrs. Haraba had been delayed at an immigration office, no other passengers were around as she neared Hall's customs belt. In Hall's presence, Mrs. Haraba sought change for a $100 bill from a porter so that she might tip him for his help with the baggage. When the porter indicated that he could not take a tip, Mrs. Haraba returned the $100 bill to the main portion of her pocketbook. The other nine $100 bills remained in a zippered compartment in the pocketbook, which she left open.

After the porter had left, Hall asked and was allowed to examine Mrs. Haraba's pocketbook. Mrs. Haraba also placed her suitcase and food carton on the conveyor belt and gave Hall her declaration. At that moment, Mrs. Haraba's daughter called her to get the children. Hall told Mrs. Haraba to attend to her daughter while she searched the purse. Mrs. Haraba turned and walked away from the conveyor belt to her grandchildren.

After completing the customs inspection, Mrs. Haraba met her son at his car outside the airport. Shortly thereafter, she opened her pocketbook and noticed that the zippered compartment in her purse was now closed. Upon opening the compartment, Mrs. Haraba discovered that her nine $100 dollar bills were missing. Accordingly, she returned with her son to the airport and met first with an airline supervisor and later with the police. The police summoned Hall who denied taking the money. Mrs. Haraba filed no formal complaint and was never repaid.

On June 9, 1983, Mrs. Erika Fischer and her husband arrived at JFK on a flight from Vienna, Austria. Mrs. Fischer proceeded to Hall's customs belt with three of the couple's four suitcases while Mr. Fischer waited for the fourth suitcase to come off the baggage carousel. Mrs. Fischer told Hall that she was in a hurry to catch a connecting flight and asked Hall to examine the first three suitcases pending Mr. Fischer's arrival. Hall agreed but asked first to examine Mrs. Fischer's handbag, which contained in its zippered compartment a small purse with eleven $100 bills. Mrs. Fischer initially refused to turn over her handbag because in seventeen prior trips to the United States nobody had ever searched her purse. Hall insisted, however, and Mrs. Fischer relented. Hall looked through the bag for over three minutes and then asked Mrs. Fischer to place one of the larger suitcases on the conveyor belt. Mrs. Fischer asked Hall first to return the handbag, and Hall replied that she had not finished examining it. Hall told Mrs. Fischer that if she insisted on waiting for her handbag, she would miss the connecting plane.

Mrs. Fischer relented and went to get the luggage that Hall had requested. Mrs. Fischer's back was turned to Hall for about thirty seconds while she placed the luggage on the conveyor belt. Subsequently, Hall returned Mrs. Fischer's handbag but did not examine the luggage. Hall then sent Mrs. Fischer on her way with her husband, who had just arrived with the fourth suitcase. On the connecting flight to Washington, D.C., Fischer noticed that ten of the eleven $100 bills were missing from her handbag. On June 11, 1983, Mrs. Fischer wrote a complaint letter to Customs concerning the missing money.

On July 26, 1983, Customs Supervisory Agent James O'Brien undertook a decoy operation directed at Hall as a result of the Haraba, Fischer and other passenger complaints. O'Brien sent a decoy, Barbara O'Keefe, posing as a recently arrived passenger to Hall's customs checkpoint. O'Keefe was carrying sixty-eight $100 bills which O'Brien had xeroxed, initialed and dusted with ultraviolet powder. The bills were divided into three packets, two of which were placed in envelopes in O'Keefe's bags. The third packet, which consisted of twenty-eight $100 bills in a small snap-top purse, was placed in the zippered portion of O'Keefe's handbag.

O'Keefe approached Hall's line and handed Hall her customs declaration which indicated that she was carrying over $5000 in currency. Hall gave O'Keefe a form to fill out and requested that O'Keefe open her bags. Hall placed the form at the opposite end of the conveyor belt from where the bags had been opened. While O'Keefe filled out the form, Hall checked the open bags. O'Keefe did not watch Hall but did hear a snap which sounded like the catch of the snap-top purse.

After the customs inspection was completed, O'Keefe met Agent O'Brien in the airport lobby where they counted the money. Three $100 bills were missing from the snap-top purse. O'Brien returned to the customs area and advised Hall that he wished to speak with her because of a problem with a passenger she had recently checked. Hall agreed to accompany O'Brien to an office. O'Brien directed one of his agents to search the wastepaper containers at Hall's station for evidence of the missing money.

Upon arriving at the office, O'Brien proceeded to tell Hall that a passenger had reported some missing money. O'Brien asked Hall to "be kind enough to help [him] out and get to the bottom as fast as possible and show [him] how much money she has on her." Hall agreed to help and removed two $20 bills and a $10 bill from her pocketbook and placed them on the desk.

O'Brien asked Hall to double check and Hall resumed looking through her bag. Hall then mentioned that her rent and car payments were due, whereupon she withdrew seven $100 bills from her bag. Upon seeing the $700, O'Brien said, "That looks like an awful lot of money, how much is there?" Hall replied that it was $700, that she had to pay her rent, and that she had intended to purchase a money order but had forgotten to do so. O'Brien told Hall not to say anything further and proceeded to examine the seven $100 bills under an ultraviolet light. Three of the bills contained O'Brien's initials and the ultraviolet dust. These three bills matched the xeroxes taken earlier. In addition, there was ultraviolet dust on Hall's hands and uniform.

O'Brien told Hall that he was retaining the seven $100 bills as evidence and would give her a receipt for them. In response she exclaimed that he "could let her have her four $100." At that point, O'Brien again told her not to say anything further and proceeded to give her the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). O'Brien informed Hall that he intended to turn the matter over to the United States Attorney for possible criminal proceedings. Hall left the office and was fired shortly thereafter.

On August 23, 1983, Hall was indicted on five counts of violating 18 U.S.C. § 654. Because of the government's difficulty in locating witnesses, two of the five counts were ultimately dropped before trial.

After the indictment, O'Brien submitted a typed report concerning the decoy operation to Special Agent Robert Walsh of Customs. O'Brien prepared the report from his notes which were undated and which were not made contemporaneously with the interview of Hall. Before preparing the report, O'Brien had discussed the decoy operation with Walsh and had reported to him the various statements Hall had made. O'Brien claimed that he gave Walsh all the information that appeared in the typewritten report including Hall's statements about her car payment and rent. Walsh remembered only Hall's statement concerning her $400.

Prior to trial, Hall's counsel moved to suppress Hall's various statements to O'Brien on the grounds that they had been obtained in violation of her *Miranda* rights. Counsel also moved to suppress the three $100 bills on the ground they were the product of an illegal search since Hall had involuntarily turned them over to O'Brien. At a suppression hearing on October 19, 1983, Judge Bramwell denied both motions to suppress, finding that Hall was not in custody, and that *Miranda* therefore did not apply. Judge Bramwell also found that Hall's production of the bills had been

voluntary and that the search was therefore consensual.

At trial, Hall denied taking money and testified that she had found the three $100 bills on the floor and had intended to turn them over to a supervisor. Hall further testified that she had not had an opportunity to do this and was too upset to explain this to O'Brien.

Also at trial, Hall's counsel cross-examined Mrs. Fischer about her complaint letter and implied that the letter gave a different sequence of events than Mrs. Fischer's direct testimony. As a result of defense counsel's use of the letter, the government offered it into evidence over counsel's objection. The government relied upon Fed.R.Evid. 801(d)(1)(B), contending that the letter was a prior consistent statement of Mrs. Fischer offered to rebut counsel's implied charge that Mrs. Fischer was misrepresenting the facts. Judge Bramwell admitted the letter.

In cross-examining Agent O'Brien, Hall's counsel attempted to show that O'Brien's testimony differed from the verbal account of the decoy operation he had given to Agent Walsh. O'Brien stated that everything he had told Walsh was memorialized in the typewritten report. When Hall's counsel subsequently called Agent Walsh as a witness, the government sought to introduce the report. After Judge Bramwell ruled that the report would become admissible as a prior consistent statement if Walsh testified, Hall's counsel declined to question Walsh, and O'Brien's report was never admitted into evidence.

On October 26, 1983, the jury found Hall guilty on counts 1, 2, and 3 of the redacted indictment. On January 5, 1984, Judge Bramwell sentenced Hall to a "split sentence" under 18 U.S.C. § 3651 (1982) of five years' imprisonment (six months in custody and the remainder suspended with five years probation) and ordered her to make restitution under 18 U.S.C. § 3579 (1982).

This appeal followed.

2. We do not reach the question of whether de-

## DISCUSSION

Hall argues that she did not freely consent to the examination of the money in her purse and that her July 26 interview with O'Brien was a custodial interrogation undertaken in the absence of the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ We believe that the issue of Hall's consent to a search is irrelevant, and that the *Miranda* claim raises at best harmless error. Whether or not Hall consented to the examination of the money she was carrying, or was in custody, the prior complaints and the disappearance of the three $100 bills from O'Keefe's bag created probable cause to search her. *See Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). O'Brien had ample cause to believe that Hall was in possession of recently stolen currency and ample reason to secure it before Hall was able to dispose of it. It flies in the face of common sense to argue that O'Brien was obliged to allow Hall to leave with an unsearched purse. The bills were thus legally obtained, whether or not Hall consented, and they unequivocally proved that Hall was in possession of the currency that had shortly before disappeared from O'Keefe's handbag. Hall's statements about rent and car payments and the request for the return of $400 added nothing of consequence to the overwhelming case already marshalled against her. Their use in evidence was thus harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ Hall's second claim is that Judge Bramwell erred in admitting Mrs. Fischer's complaint letter as a prior consistent statement, Fed.R.Evid. 801(d)(1)(B), and in ruling that he would admit O'Brien's typewritten report if Hall's counsel elicited testimony from Agent Walsh. These rulings were either correct or harmless. While the complaint letter may not have been admissible under Rule 801(d)(1)(B),[2] the government

fense counsel's cross-examination of Mrs. Fisch-

was entitled to use it in light of the cross-examination of Mrs. Fischer which expressly stated that the letter was inconsistent with her testimony. We believe that a party may not be permitted to suggest that an inconsistency exists between testimony and a document and also prevent the jury from scrutinizing the document in question. Agent Walsh's testimony would not have benefitted Hall since she ultimately conceded virtually every statement attributed to her by O'Brien. Since Hall wanted to use Agent Walsh's testimony to undermine O'Brien's account of the July 16 interrogation, her own admissions destroyed his usefulness as a witness on her behalf.

Hall's final claim is that the restitution statute, 18 U.S.C. §§ 3579, 3580, is unconstitutional. Hall did not raise this claim before the district court despite the fact that she had ample opportunity to present it. Having failed to alert Judge Bramwell to her claim, she is precluded from raising it on appeal. *Accord United States v. Hermann*, 524 F.2d 1103, 1104 (2d Cir.1975); *United States v. Foddrell*, 523 F.2d 86, 87 n. 2 (2d Cir.), *cert. denied*, 423 U.S. 950, 96 S.Ct. 370, 46 L.Ed.2d 286 (1975).

We therefore affirm the judgment.

er amounted to a claim of "recent fabrication or improper influence or motive" as required by

Rule 801(d)(1)(B). *See United States v. Quinto*, 582 F.2d 224 (2d Cir.1978).