UNITED STATES of America, Appellee,

v.

**William C. BRENNAN, Appellant.**

**No. 1297, Docket 86–1081.**

United States Court of Appeals,
Second Circuit.

Argued May 19, 1986.

Decided Aug. 11, 1986.

Paul B. Bergman, New York City, for appellant.

Kevin J. O'Brien, Asst. U.S. Atty. (Reena Raggi, U.S. Atty. E.D.N.Y., and Jane Simkin Smith, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before OAKES, MESKILL and MAHONEY, Circuit Judges.

OAKES, Circuit Judge:

William C. Brennan, a former justice of the Supreme Court of the State of New York in Queens County, appeals from a judgment of conviction entered by the United States District Court for the Eastern District of New York, Jack B. Weinstein, Chief Judge, following a four-week jury trial. The jury found Brennan guilty on twenty-six counts involving the taking of bribes and the corruption of his judicial office with respect to four criminal cases in Queens. He was convicted on both a substantive and a conspiracy count under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 2, 1962(c), (d) (1982), fourteen counts of interstate travel in aid of racketeering, 18 U.S.C. §§ 2, 1952(a) (1982), nine counts of fraud by wire communication, 18 U.S.C. §§ 2, 1343 (1982), and one count of attempted extortion, 18 U.S.C. §§ 2, 1951(a) (1982). Brennan was sentenced to concurrent terms of imprisonment of five years each on Counts One, Two, and Twenty-six and to probation for an additional five years on the remaining twenty-three counts, a condition of probation being that he have nothing to do, directly or indirectly, with the law, law enforcement, or the public trust. Brennan was also assessed $224,300 in fines, RICO forfeiture, and special assessments. 629 F.Supp. 283 (1986).

Brennan raises two issues on appeal. First, he contends that Judge Weinstein erred in permitting the Government to read into evidence on redirect examination grand jury testimony of Anthony Bruno, a government witness, to rehabilitate Bruno's testimony, since that testimony was not admissible as nonhearsay under Fed.R. Evid. 801(d)(1)(B). Second, Brennan contends that the court violated Fed.R.Evid. 404(b) by admitting evidence of "other crimes," to wit, that Brennan had corrupted three criminal cases in addition to the four cases charged in the indictment. For the reasons set forth, we reject these contentions and affirm the district court.

## BACKGROUND

Bruno was the central witness in the Government's case. According to his testimony, he served as the middleman between the state court criminal defendants and then-Justice Brennan, and as such was the only person who could directly implicate Brennan in the bribery and corruption schemes. The Government's proof involved four cases described in the indictment—the *Messina, Botta, Romano,* and *Polisi* cases—and three other cases—*Pastore, Cataldo,* and *Donnelly.* Bruno was a long-time friend of Brennan's and also was acquainted with several convicted criminals and organized crime figures. The following factual background is based on the evidence adduced by the Government at trial.

In the early 1970's, Joseph Pastore asked Bruno to intercede with Brennan in connection with Pastore's pending felony assault case, which was before the justice. Bruno spoke to Brennan, who eventually responded that something could be done for $10,-000. Pastore paid that sum to Bruno, who later turned it over to Brennan in Bruno's

house. Court records show that Pastore pled guilty to a misdemeanor before Justice Brennan in November 1973 and received a conditional discharge.

In 1974, Bruno discussed with Nicholas Botta, a convicted bookmaker and a loan shark, the possibility of early discharge from his five-year probation sentence imposed by Brennan. At some point Botta also mentioned that his partner, Lawrence Messina, had a gambling case before Brennan. Bruno then asked Brennan if he could help Botta and Messina; Brennan replied that he would look into the *Messina* case and told Bruno that Botta should visit Brennan in his chambers. Botta subsequently appeared before Brennan in chambers and explained why his family wanted him discharged from probation. Brennan discharged Botta in May 1975, two years before the completion of his sentence. The ostensible reason for the early discharge was that the supervising probation officer told Brennan that he already intended to release Botta from his requirement of reporting. The probation officer testified, however, that he had consistently refused Botta's requests for early discharge because he felt Botta was part of organized crime, and that he doubted that he had had the conversation with Brennan on which the latter claimed to rely. Bruno, not the probation department, notified Botta that he need no longer report to his probation officer. As to Messina, after several adjournments Brennan dismissed his case in October 1974 on the ground that the People had failed to provide him with a speedy trial.

According to Bruno, Botta paid him $2,000 following his early discharge, which Bruno passed on to Brennan. Subsequently, Botta paid Bruno $12,000 for Messina's case. Bruno gave this sum to Brennan, who returned $5,000 to Bruno and kept $7,000 for himself. Botta testified that he received $15,000 from Messina after telling him why he needed the money. He stated that he paid Bruno before anything was done in their cases—first, $12,000 for Messina, and later $3,000 for his own case. Messina testified that he gave Botta $15,-

000 and that he knew what the money was for.

About this time Dominick Cataldo approached Bruno and offered $3,000 for Brennan in a first degree robbery case pending before the appellant. Bruno went to Brennan who, after looking into the matter, told Bruno he would accept the $3,000. Cataldo gave the money to Bruno, who gave it to Brennan. In February 1974 Brennan suppressed identification evidence linking Cataldo to the robbery, which led to dismissal of the indictment. After the dismissal, Brennan told Bruno, "[D]on't let them kid you that they didn't need me on this, they did."

After Cataldo's case was dismissed, John Donnelly approached Bruno concerning a weapons case in which he was to be tried before Brennan. In a proceeding before another judge, Donnelly had been convicted of a Class D felony and sentenced to an indeterminate prison sentence not to exceed five years. The Appellate Division, however, reversed the conviction and ordered a new trial and the case had been reassigned to Brennan. After speaking with Donnelly, Bruno contacted Brennan, who later said something could be done for $15,000. Donnelly gave $10,000 to Bruno, who delivered that sum to Brennan. Brennan told Bruno to collect the balance for himself, but Bruno was unable to do so. In November, 1974, Donnelly pled guilty to a Class A misdemeanor and Brennan, ignoring the district attorney's recommendation of a one-year prison term, sentenced Donnelly to time served and a $250 fine.

Brennan's corruption of John Romano's case was somewhat more complicated. After that case, involving attempted murder in the second degree, was assigned to Brennan in the spring of 1980, Dominick Cataldo approached Bruno on behalf of friends or relatives of Romano's and told Bruno that Brennan would be paid $15,000 if he would help Romano. Bruno informed Brennan of the $15,000 offer, and he replied that Bruno should tell the Romano party that "we will see what we can do."

When Bruno next spoke to Cataldo, however, Cataldo said that the Romano group had gone elsewhere. After a bench trial before him, Brennan told Bruno that he did not know what to do because the case could go either way. He speculated that since he never received any money, Romano's attorney must have promised to fix the case and then pocketed the bribe. He then asked Bruno how he would decide the case. "[Y]ou're the judge," Bruno responded, but added, "[I]f you convicted him, you know, it will be a good lesson to that attorney." Brennan then convicted Romano on two lesser-included felony offenses.

Romano's father, "Footsie" Romano, contacted Bruno, this time through Nicholas Botta. Bruno talked to Brennan, who said that there was a loophole in the case and that something could be done. Bruno then discussed the case with the Romano group and insisted on the original $15,000 price. Romano's counsel then produced an affidavit that turned out to be perjurious from a federal prison inmate who claimed that he, not Romano, was responsible for bullet holes at the scene of the crime. This "newly discovered evidence" was brought before Brennan as the basis for a new trial in December 1980. "Footsie" Romano then gave Bruno $10,000, claiming it was all he could raise. Bruno passed the money on to Brennan, who returned $5,000 to Bruno. Brennan then granted Romano's motion to set aside the verdict based on newly discovered evidence. On retrial, before a different judge, Romano was acquitted.

The final act of bribery for which Brennan was charged involved Salvatore Polisi, a convicted bank robber and former associate of Donnelly and Cataldo. Polisi, charged in Queens with possession and sale of a controlled substance and facing a long sentence as a recidivist, decided to cooperate with the Government in an undercover capacity. Polisi contacted Bruno and flew down to Florida, where Bruno was then living, in late January, 1985, to solicit help in fixing the case, which was before Justice Rotker. Most of their conversations were tape-recorded. On January 31 Bruno told Polisi that Brennan was coming to Florida

in a few days and that, before the justice left, Bruno would call him in New York to see what could be done in Polisi's case. Polisi wrote down on the back of a menu the charges and the names of the judge and lawyers in his case, so Bruno could relay this information to Brennan. Bruno called Brennan at his chambers the following day. Queens Supreme Court records show that on that day the Polisi case file was delivered from the record room directly to Brennan's chambers, although the case was not before him. On February 4, after Brennan had arrived in Florida, Bruno and Brennan discussed the Polisi case at the Gulfstream Racetrack. Bruno wrote the details of the case on the back of a betting slip, which the FBI recovered in a search of Bruno's home. When Bruno asked Brennan how he could influence a case that was not before him, the appellant told him that the less he knew, the better off he was. Bruno and Brennan agreed on a price of $25,000 as a down payment, and another $75,000 if Polisi went free. Bruno then relayed this information to Polisi.

Several conversations followed between Brennan and Bruno, and several between Bruno and Polisi, at one of which Bruno frisked Polisi for a recording device but failed to locate one. Brennan eventually told Bruno when the two met again at the Gulfstream Racetrack to take the $25,000 from Polisi and to keep $10,000 for himself. Brennan also instructed Bruno to wait for his phone call from New York before bringing him the rest of the money.

Polisi received $25,000 from the FBI and delivered it to Bruno. Bruno, suspecting FBI surveillance, placed the money in a safety deposit box at a local bank. On February 20, Brennan called Bruno and instructed him to come to New York, adding, "[D]on't forget to bring that with you." When a worried Bruno asked if he had to come, Brennan told him not to, but that he would call him back. After Brennan suspected that he was being followed, he telephoned Bruno and said that something had come up. Brennan later called Bruno and told him, "[T]ell your friend to

look elsewhere for his apartments and give his deposit back." Bruno then returned the $25,000 to Polisi, who gave Bruno $500. On March 7 Bruno was arrested. In an FBI interview on March 11 Brennan denied ever having heard the name Salvatore Polisi or discussing with Bruno any cases that were in his court or in the Queens courthouse.

Bruno made three appearances before the grand jury—on March 22, April 2, and May 7, 1985, pursuant to a plea agreement involving his cooperation with the Government. At his initial appearance Bruno claimed that he did not intend to have Polisi's case "fixed" by Justice Brennan, but rather that he wanted Brennan's help in a "scam" to get money from Polisi by telling him that Brennan would fix his case. He did testify, however, that he called Brennan in New York and asked him to look up Polisi's record and to get information on his case, that he told Brennan that Polisi wanted his case fixed, that Brennan did provide him with details of Polisi's case, that Brennan said he did not know what he could do at this point and that he needed more information about the case, and that Brennan told him to ask for $100,000, to take $25,000, and not to promise Polisi anything. Bruno also testified before the grand jury that at one point Brennan said that he wanted no part of the deal, but that after Bruno frisked Polisi without finding anything Brennan overcame his suspicions and was satisfied that Polisi could be trusted. In addition, Bruno testified that Brennan told him to bring the Polisi money to New York so that Brennan could check to make sure it was not identifiable, that Brennan later called him from New York and told him to bring up the money, but that Bruno conveyed to Brennan his hesitancy to do so. In addition, Bruno testified that Brennan later called and, by saying that Bruno should tell his friend to look for an apartment elsewhere, told him that the deal was off. Bruno was not asked any questions about Brennan's corruption of other cases.

On April 2, Bruno told the grand jury that his original testimony was false on several points. He stated that, contrary to his earlier testimony, he had intended that Brennan fix the case, that he had planned to give Brennan a share of the money, and that Brennan had agreed to look into the case to see if any thing could be done to corrupt it. Bruno testified that he held back this information on March 22 because he was a long-time friend of Brennan's and because he wanted to spare Brennan's family the embarrassment that would be caused. At the April 2 and May 7 grand jury appearances Bruno testified as to his and Brennan's corruption of the other six cases.

At trial, the Government, in its opening statement, told the jury that Bruno had on March 22 "lied to the grand jury to protect his friend Bill Brennan," but that he told the "whole and complete truth" in his later appearances. Defense counsel, in his opening statement, argued that Bruno had told "exactly what the truthful story is" on March 22, which was that Bruno was "engaged in a scam operation with Polisi" to get $25,000. Brennan's attorney added that the Government wanted "to get a Supreme Court Judge," so Bruno changed his story to implicate Brennan in order to avoid a substantial jail term.

On direct examination Bruno testified that he did not tell "the whole truth" to the grand jury on March 22, but that he did tell "the whole truth" in his April appearance. On cross-examination, defense counsel elicited from Bruno that he lied to the grand jury on March 22 so that "I wouldn't hurt Judge Brennan as much as I thought I could." Bruno also stated that he did not say anything about the earlier bribery cases in his initial grand jury appearance.

Over the defendant's objection, Judge Weinstein permitted the Government to read portions of Bruno's March 22 and April 2 grand jury testimony into evidence on redirect examination of Bruno. The court ruled that the testimony could not come in as nonhearsay under Fed.R.Evid. 801(d)(1)(A) or (B) or for completeness under Fed.R.Evid. 106. The court found,

however, that the testimony was "highly relevant on the issue of credibility," and added, "I do not plan to keep anything out of any substantial weight with respect to [Bruno's] credibility." Judge Weinstein then instructed the jury that the testimony was hearsay and could be used only for assessing credibility. In a hearing on Brennan's post-trial motion for acquittal, Judge Weinstein stated,

> [U]ntil that grand jury testimony came in ..., based on [defense counsel's] cross examination, I was under the impression that before the grand jury [Bruno] had taken the position that Brennan had nothing to do with this at all. It was only after I permitted the United States Attorney, properly, to explain what happened throughout the grand jury testimony that I became aware that in his first appearance before the grand jury he substantially implicated Brennan.

## DISCUSSION

The primary issue before this court is whether the district court erred in permitting the Government to rehabilitate Bruno's credibility with his prior grand jury testimony. There is no dispute that, as Judge Weinstein noted, Bruno's "credibility was the chief issue in the case." While other witnesses testified that they paid money to Bruno, and certain documentary evidence and tape recordings tended to implicate Brennan, only Bruno's testimony provided direct evidence of payments to Brennan for the purpose of corrupting cases.

■■■ Judge Weinstein correctly found that the grand jury testimony was inadmissible under Fed.R.Evid. 801(d)(1)(A) or (B). Statements admitted under Rule 801(d) are not hearsay and therefore are admissible as substantive evidence. Rule 801(d)(1)(A) permits the introduction of prior statements made under oath that are *inconsistent* with the declarant's trial testimony. Here, the Government sought to show that Bruno's March 22 testimony was fundamentally, if not precisely, *consistent* with his trial testimony. Under Rule 801(d)(1)(B) a prior consistent statement is admissible if offered to rebut a charge against the declarant of recent fabrication or improper influence or motive. In other words, the prior statement must have been made before the declarant had a motive to fabricate. *See United States v. Quinto,* 582 F.2d 224, 232 (2d Cir.1978). Here, Bruno had a motive to lie during the entire period in which he appeared before the grand jury and the trial court.

In *Quinto,* we stated that the standards for admitting prior consistent statements as nonhearsay under Rule 801(d)(1)(B) are precisely the same as the standards for admitting the statements "for the more limited purpose of rehabilitation." *Id.* at 233. In *United States v. Rubin,* 609 F.2d 51 (2d Cir.1979), *aff'd on grant of cert. limited to other issue,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981), Judge Friendly, in a concurrence, took issue with that "dictum," and argued that different standards of admissibility should apply, depending on whether the evidence is to be used for substantive or rehabilitative purposes. *See id.* at 66-70. He contended that because rehabilitation is a " 'more limited purpose,' " *id.* at 69 (quoting *Quinto,* 582 F.2d at 233), the standard should be less rigorous than for substantive evidence. Judge Friendly maintained that "a court that has received inconsistent statements ... for impeachment should be generous in allowing consistent ones for rehabilitation, since they bear on whether, looking at the whole picture, there was any real inconsistency." *Id.* at 70.

This court recently resolved the controversy in Judge Friendly's favor in *United States v. Pierre,* 781 F.2d 329 (2d Cir.1986), decided less than two months after Judge Weinstein's ruling in the case at bar. In *Pierre,* Judge Newman first noted that "[t]he law of our Circuit concerning the permissible use of a prior consistent statement is not exactly a seamless web," *id.* at 330, and then canvassed this circuit's case law. *Id.* at 331-33. In light of that inquiry the court found that prior consistent statements may be admissible for rehabilitation

even if not admissible under Rule 801(d)(1)(B):

> [A] prior consistent statement may be used for rehabilitation when the statement has a probative force bearing on credibility beyond merely showing repetition. When the prior statement tends to cast doubt on whether the prior inconsistent statement was made or on whether the impeaching statement is really inconsistent with the trial testimony, its use for rehabilitation purposes is within the sound discretion of the trial judge. Such use is also permissible when the consistent statement will amplify or clarify the allegedly inconsistent statement. It matters not whether such use is deemed a permissible type of rehabilitation or only an invocation of the principle of completeness, though not a precise use of Rule 106.

*Id.* at 333; *see also United States v. Hall,* 739 F.2d 96, 100–01 (2d Cir.1984); *United States v. Parodi,* 703 F.2d 768, 784–87 (4th Cir.1983). The court in *Pierre* distinguished *Quinto* on the ground that in *Quinto* the witness had only been subject to a "generalized attack on his credibility." *Id.* at 334; *see Quinto,* 582 F.2d at 229 & n. 2 (prosecutor argues that defendant had made general attack on witness's credibility).

Appellant does not challenge the position taken by this court in *Pierre,* but argues that *Pierre* is inapplicable to his case. Appellant contends that where the defendant makes only a generalized attack on a witness's credibility, *Quinto* is still good law, and evidence inadmissible under Rule 801(d)(1)(B) is inadmissible for rehabilitation. We have no quarrel with that proposition, but we do disagree with appellant's argument that he made only a generalized attack on Bruno's credibility. Instead, we agree with the Government that Brennan attempted to impeach Bruno with allegedly inconsistent statements made before the grand jury.

Brennan's position, of course, is not that he did not use Bruno's grand jury appearances to attack his credibility. Both in his opening and in his cross-examination of Bruno, defense counsel brought out that Bruno had lied before the grand jury. Rather, appellant contends that, first, he elicited from Bruno no more than the Government already had, and, second, the defense did not impeach Bruno with any specific prior inconsistent statements made before the grand jury.

 As to the first contention, it is true that it was the Government that first brought out, initially in its opening and, in more detail, on direct examination, that Bruno had lied to the grand jury in March to protect Brennan. Defense counsel, however, made no objections to these references to the grand jury and, in his opening and on cross-examination, reiterated that Bruno lied to the grand jury. Moreover, counsel in its opening added substantive information about the March testimony: Bruno was said to have testified to the effect that "I'm engaged in a scam operation with Polisi and I got the 25 thousand dollars." [1] Defense counsel also stated in the opening that Bruno later changed his story to satisfy the prosecution—"I'll give you Judge Brennan"—and thus the defense furthered the impression, originally created by the prosecution, that Bruno had not implicated Brennan in his first appearance. The Government's decision to refer to Bruno's grand jury testimony was apparently intended to anticipate a defense strategy to impeach Bruno with his inconsistent testimony before the grand jury. Significantly, rather than being satisfied with the Government's "impeachment" of its own witness and then using those statements in its summation, appellant chose to emphasize Bruno's false testimony, and to expand somewhat upon it. While the Government

---

1. Bruno also admitted on cross-examination that he had not told the grand jury in March about any of the other six cases that Brennan apparently had corrupted. While this testimony may have permitted the Government to show that Bruno had been questioned only on the *Polisi* case in his initial appearance, it was not sufficient to permit the Government to read the grand jury transcript relating to the *Polisi* case.

contributed to the false impression that Bruno initially exonerated Brennan, that fact does not prevent the Government from responding to *appellant's* impeachment of Bruno, and that is especially true where, as here, the trial judge found that that impeachment left the jury with a significant misimpression.

■ Brennan's second contention is that the Government must point to a specific inconsistent statement as a predicate to introducing prior consistent statements and that the defense did not introduce a specific statement from the grand jury into evidence. It matters not, however, whether the inconsistent statement is put in through specific testimony or through mischaracterization or suggestive or misleading cross-examination. *See, e.g., United States v. Zito*, 467 F.2d 1401, 1404 (2d Cir.1972) (prior consistent statements admitted to rebut defense counsel's suggestions on his opening and on cross-examination that witness fabricated testimony). The question is not whether the defense introduces a specific statement, but rather whether it has made a specific attack on a witness's credibility. *See Pierre*, 781 F.2d at 333–34. Otherwise, as the Government argues, the defendant would be free to attack the witness with suggestive or misleading cross-examination or mischaracterization as long as he did not introduce a specific prior statement. In this case, the prior inconsistent statement is the strong implication that Bruno exonerated Brennan before the grand jury. The defense specifically attacked Bruno's credibility with respect to his grand jury testimony, and the Government was allowed to use that testimony to rehabilitate him in response to that specific attack.

■ Reading the grand jury testimony had "a probative force bearing on credibility beyond merely showing repetition," *id.* at 333, because it was not used to show that Bruno told the same story twice. Rather it "amplif[ied] or clarif[ied] the allegedly inconsistent statement," *id.*, by showing the rather considerable extent to which Bruno actually inculpated Brennan

and the earlier testimony thereby helped the jury to evaluate the veracity of his trial testimony. It also "cast doubt ... on whether the impeaching statement is really inconsistent with the trial testimony," *id.*, by revealing the extent to which the grand jury and trial testimony were consistent. In short, once the defense attacked Bruno's credibility by suggesting that he had originally exculpated Brennan before the grand jury, the district court did not abuse its discretion by permitting the Government to rehabilitate Bruno with that testimony.

Brennan also objects to the decision of the district court to permit the introduction of "other crimes" evidence under Fed.R. Evid. 404(b). This evidence involved the alleged fixing of the *Pastore, Cataldo*, and *Donnelly* cases, which were not charged in the indictment. Appellant argues that the evidence was used only to bolster Bruno and that the critical issue at trial was whether Brennan committed the act, not whether he had knowledge and intent. The Government argues that the evidence was not introduced on the questions of knowledge and intent, but to show a pattern of racketeering activity under the RICO counts and to complete the story of the crimes charged.

■ Under the "inclusionary" approach followed in this circuit, "evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity," *United States v. Harris*, 733 F.2d 994, 1006 (2d Cir.1984), as long as it is "relevant to some disputed issue in the trial" and satisfies the probative-prejudice balancing test of Fed.R. Evid. 403. *United States v. Figueroa*, 618 F.2d 934, 939 (2d Cir.1980). The trial judge has broad discretion to admit "other crimes" evidence under Rule 404(b), and he will not be overturned on appeal absent abuse of discretion. *Harris*, 733 F.2d at 1006–07. "Other crimes" evidence may be admitted to complete the story of the crimes charged. In *Harris*, for example, evidence of the defendant's prior narcotics dealings with a witness was admitted to inform the jury of the background to the

charged conspiracy and to show the basis for the defendant's trust of the witness. *Id.; see also United States v. Moten,* 564 F.2d 620, 628 (2d Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 489, 54 L.Ed.2d 318 (1977); *United States v. Torres,* 519 F.2d 723, 727 (2d Cir.), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975).

■ Here, evidence of corruption of the *Pastore* case, which is the first case Brennan is alleged to have fixed, helped explain to the jury how the illegal relationship between Brennan and Bruno developed. The corruption of the *Cataldo* and *Donnelly* cases was integral to an understanding of Bruno's and Brennan's involvement in the *Romano* and *Polisi* cases. Cataldo and Donnelly were former partners in crime with Polisi. Polisi learned of Bruno's connection with Brennan through Cataldo's brother. Bruno and Polisi discussed on several occasions the fact that both Cataldo and Donnelly had had their cases fixed by Brennan. Without this evidence the jury would have had a truncated and possibly confusing view of the respective roles played by Bruno and Brennan and of the basis for the trust between Brennan and Bruno and between Bruno and Polisi. Appellant makes no showing pursuant to Fed. R.Evid. 403 that the prejudicial impact of the "other crimes" evidence outweighed its probative value. The district court therefore did not abuse its discretion in admitting "other crimes" evidence to enable the jury to understand the complete story of the crimes charged. We have no need to reach the Government's alternative argument that the evidence was permissible to show a pattern of racketeering activity.

Judgment affirmed.