UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard W. MILLER,
Defendant–Appellant.

No. 86–5200.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 13, 1988.

Decided April 25, 1989.

Stanley I. Greenberg and Joel Levine, Los Angeles, Cal., for defendant-appellant, Richard W. Miller.

Russell Hayman, Asst. U.S. Atty., Deputy Chief, Major Narcotics Section, Los Angeles, Cal., for plaintiff-appellee, the U.S.

Before NELSON, REINHARDT and O'SCANNLAIN, Circuit Judges.

NELSON, Circuit Judge:

Richard W. Miller was convicted of bribery, conspiracy to commit espionage, copying national defense information and delivering it to a foreign government, and communicating confidential information to a foreign government with the intent to harm the United States or aid a foreign government in violation of 18 U.S.C. §§ 201(c), 371, 793(b), 794(a) & (c); and 50 U.S.C. § 783(b) (1982). The district court

exercised jurisdiction pursuant to 18 U.S.C. § 3231 and we have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse Miller's conviction and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

The government charged Miller, an FBI agent assigned to the Soviet Foreign Counter–Intelligence ("FCI") Unit in Los Angeles, with various offenses relating to the alleged delivery of documents to representatives of the Soviet Union. At trial, Miller contended that he never intended to harm the United States and that all his actions were taken to benefit the FBI.

Miller met codefendant Svetlana Ogorodnikova ("Svetlana") in 1984. Svetlana had emigrated from the Soviet Union in 1973 with her husband Nikolay, another codefendant. She entertained Soviet officials in Los Angeles and performed errands for them. Miller contends, as Svetlana testified, that she received Soviet cultural films which she rented for profit to the Russian–American community in exchange for these tasks. The government presented testimony that Svetlana and Nikolay performed such tasks to earn a "right to return" to the Soviet Union, and that the tasks included showing propaganda films.

In 1982, the FBI tried to recruit Svetlana as an informant. Her recruiter, agent John E. Hunt, testified that he and she were building rapport during an "evaluation period" which included approximately 55 meetings. He said that she provided some intelligence information and was used in one FBI operation. However, the FBI eventually decided not to use her as an informant. Svetlana testified that she and Hunt were lovers. Hunt testified that in 1982, he attempted a double agent scheme by approaching the Soviets through Svetlana. He testified that the Soviets were aware of his meetings with Svetlana and he was testing whether the Soviets would attempt to recruit him. Hunt and Svetlana stayed in occasional contact during the period she associated with Miller.

Svetlana contacted the FBI in May of 1984, claiming to have valuable informa-

tion. Miller was given authority to meet with her. After that meeting, he continued to see her without always reporting their meetings to his supervisors. They became lovers. The government contends that she asked him to provide information to help her locate three defectors in June 1984, and that he asked an FBI superior if the CIA could provide the information. Svetlana departed to visit the Soviet Union in June. When she returned to Los Angeles in August, she and Miller resumed meeting. She gave gifts to Miller and offered him money on numerous occasions. In early August, Svetlana asked Miller to work for the Soviet Union by providing her with classified documents. He in turn asked her for $15,000 in cash and $50,000 in gold.

Miller contends that he solicited the money only to "play along." He claims that although he wanted to convince the Soviets that he intended to provide classified information, he never actually intended to complete an exchange of documents for money. Miller had had a checkered career with the FBI and presented testimony that he wanted to leave the FBI in a "blaze of glory." He had not told his supervisors about the scheme but said he planned to do so when the scheme was at a more advanced stage. Svetlana testified in support of the defense theory. She said Miller told her that he would *promise* the Soviets everything, but that he could do no harm without the approval of his boss. While Miller had not reported his plan to the FBI, he had told Larry Grayson, a private investigator who sometimes worked as an FBI informant, about the scheme and asked for Grayson's assistance. However, when Grayson later asked Miller about the scheme, Miller told him to forget about it.

Svetlana and Miller traveled to San Francisco in late August 1984. She entered the Soviet consulate there while Miller waited a few blocks away. The government contends, based on Miller's statements to FBI agents during his interrogation, that she delivered Miller's FBI credentials and a classified document, the Positive Intelligence Reporting Guide ("PIRG"), to the Soviets. The PIRG is an annual docu-

ment that sets forth the intelligence needs of the United States worldwide.

In late September 1984, Svetlana and Miller made arrangements for a trip to Vienna to meet with Soviet officials. He prepared for the trip by readying his passport and shopping with Svetlana. He maintains that he never planned to go to Vienna and that he was surprised to learn that she had actually reserved the tickets for herself and "R. Miller." He says he then decided that the plans with the Soviets were sufficiently advanced that he could inform the FBI. On September 27, 1984, he approached his supervisor, Agent Bryce P. Christiansen, and reported his claimed double agent scheme.

The FBI, however, already had begun surveillance of Miller and Svetlana in early September 1984. They placed wiretaps in Miller's home, car, and office, as well as in the Ogorodnikovas' home and cars. The FBI also used physical surveillance. The government contends that Miller was aware of the surveillance by September 27 and then approached Christiansen with a "cover" story. They note that his story contradicted some of his later admissions during interrogation.

After his statement to Christiansen, Miller underwent five days of interrogation. Miller talked to the FBI voluntarily and waived his *Miranda* rights in writing. However, he contests the reliability of his admissions during this period. Miller eventually admitted giving Svetlana at least one document, the PIRG. He consented to searches of his two residences and his office, which yielded many FBI documents, some of them classified.

The Ogorodnikovas' trial was severed from that of Miller. After six weeks of trial, Svetlana and Nikolay pleaded guilty to conspiracy to commit espionage. Miller's first trial lasted three months and resulted in a mistrial when the jury was deadlocked after three weeks of deliberations. After a four-month trial, a jury convicted Miller on six counts on June 19, 1986. On July 14, 1986, Miller was sentenced to two concurrent life terms plus an additional concurrent term of 50 years and

fined $60,000. He is currently in custody. His appeal is timely.

## DISCUSSION

### 1. The Admission of Polygraph Information.

We review the district court's decision to admit the polygraph evidence for abuse of discretion. *See United States v. Polizzi,* 801 F.2d 1543, 1555 (9th Cir.1986).

Miller insisted during his interrogation period and at trial that he had acted only to benefit the FBI. He consented to take several polygraph tests during his interrogation. An FBI polygraph examiner, James Murphy, told Miller that he had failed the polygraph tests. Miller did not trust Murphy and asked for a new examiner on September 29. The FBI's Chief Polygrapher, Paul K. Minor, met with Miller the next day to conduct prepolygraph interviews, although Minor ultimately never administered a polygraph exam to Miller. During the interviews with Minor, Miller stated that he thought that Svetlana had taken his FBI credentials into the Soviet Consulate in San Francisco. Miller expressed concern to Minor over his prior polygraph results. On October 1, 1984, Minor suggested that the polygraph results would be more accurate if Miller would give definite, unequivocal answers to the questions. Miller then first admitted that he had given Svetlana the PIRG, a classified document.

Before trial, Miller moved to have any evidence concerning his polygraph examinations excluded on the ground that its prejudicial effect outweighed its probative value. The government argued that, if the defendant intended to contest the voluntariness of his admissions before the jury, then the polygraph evidence should be admitted solely for the purpose of explaining the sequence of events that led to Miller's admissions. Miller responded that he would not challenge the voluntariness of his admissions at trial, but that he would attack their reliability. The trial court ruled that if Miller chose to challenge the admissions at trial, then it was only fair to permit the

government, in response, to "set the scene" which it believed precipitated the admissions. At trial, the defendant did challenge the reliability of his admissions, through both cross-examination and other evidence. Accordingly, the trial court permitted the government to introduce evidence concerning Miller's polygraph examinations. An FBI interrogator (Torrence), as well as Murphy, testified that Miller had been told that he had failed the exams. Indeed, the government went further and questioned each of these witnesses about the specific questions Miller was asked and the responses he gave.

On appeal, Miller challenges the trial court's admission of this testimony, arguing that the court was incorrect in its determination that the prejudicial effect did not outweigh the probative value. We review such a ruling only for abuse of discretion.

We begin by noting that this circuit generally disfavors the admission of polygraph evidence. In *Brown v. Darcy*, 783 F.2d 1389 (9th Cir.1986), we held it erroneous to admit polygraph evidence to establish the truth or falsity of a party's statements unless the parties stipulate to the admission of the evidence and the court determines that the polygraph was administered in a reliable manner.[1] We concluded that such a holding was consistent with our uniformly "inhospitable view" towards the admission of unstipulated polygraph evidence. 783 F.2d at 1394. Polygraph evidence has an "overwhelming potential for prejudice," *id.* at 1395, given its questionable reliability and its "misleading appearance of accuracy," *United States v. Falsia*, 724 F.2d 1339, 1342 (9th Cir.1983). Thus, polygraph evidence is generally excluded because of the danger that the jury will misuse it, giving it substantially more weight than it deserves.

However, we also noted in *Brown* that polygraph evidence might be admissible if it is introduced for a limited purpose that is unrelated to the substantive correctness of the results of the polygraph examination.

783 F.2d at 1397; *see also United States v. Bowen*, 857 F.2d 1337, 1341 (9th Cir.1988) ("If the polygraph evidence is being introduced because it is relevant that a polygraph was given, regardless of the result, then it may be admissible...."). Nonetheless, we cautioned in *Brown* that polygraph evidence should not be admitted, even for limited purposes, unless the trial court has determined that "the probative value of the polygraph evidence outweighs the potential prejudice and time consumption involved in presenting such evidence." *Id.* at 1397 n. 14; *see also Bowen*, 857 F.2d at 1341.

A number of cases in other circuits have addressed the issue of the extent to which polygraph evidence may be used for limited purposes. In the leading case of *Tyler v. United States*, 193 F.2d 24 (D.C.Cir.1951), *cert. denied*, 343 U.S. 908, 72 S.Ct. 639, 96 L.Ed. 1326 (1952), the defendant confessed to murder after being told by a polygrapher that his reactions during a lie detector test indicated that he was not telling the truth. When the polygrapher subsequently testified to this fact at trial, the defendant objected. The trial court overruled the objection, holding that the testimony was admissible "as revealing circumstances leading to the confession," although the trial court agreed that the testimony was not admissible for the purpose of showing that the defendant lied. *Id.* at 31. The court gave the jury a limiting instruction to this effect, admonishing them that the polygrapher's testimony was only admitted for the purpose of deciding whether the confession was voluntary. *Id.* The D.C. Circuit affirmed, holding that the limiting instruction obviated any prejudicial effect.

*Tyler* was followed in *United States v. Kampiles*, 609 F.2d 1233 (7th Cir.1979), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980). In *Kampiles*, the Seventh Circuit upheld a trial judge's ruling that if the defendant sought to challenge at trial the voluntariness of his confession then the prosecution would be permitted to introduce evidence that the defen-

---

1. Although *Brown* was a civil case, its *per se* rule against unstipulated polygraph evidence applies with equal force in criminal cases. *See United*

States v. Bowen, 857 F.2d 1337, 1341 (9th Cir. 1988).

dant confessed after being told that he had failed a polygraph. The Seventh Circuit held that "[i]t would have been unfair to allow defendant to present his account of his admissions ... without allowing the Government to demonstrate the extent to which the failure of the polygraph precipitated the confession." 609 F.2d at 1244. The Third Circuit recently upheld, against a sixth amendment challenge, a ruling similar to that in *Kampiles*. *United States v. Johnson*, 816 F.2d 918, 923 (3d Cir.1987).

In *United States v. Hall*, 805 F.2d 1410 (10th Cir.1986), the trial judge had warned the defendant in advance that if he sought to impugn the quality of the government's investigation, he would allow the agent who supervised the investigation to testify that a full-scale investigation was not deemed necessary because the defendant had failed a polygraph examination. At trial, the defendant did raise the issue of the investigation's quality, and accordingly the fact that he had failed a polygraph was admitted, with an appropriate limiting instruction. The Tenth Circuit upheld the defendant's conviction, holding that the admission of the testimony was proper under *Tyler* and *Kampiles*. 805 F.2d at 1416–17.

■ These cases establish that, in certain circumstances, a limited amount of testimony concerning a polygraph may be introduced for limited purposes.[2] Of more importance for this case, however, each of the cases just described presented a situation in which the trial judge had carefully circumscribed the extent of the testimony concerning the polygraph examination. In *Tyler*, the prosecution only put into evidence the simple fact that the defendant confessed after being told that he had failed a polygraph exam; the specific questions and answers given during the exam were *not* put into evidence. Indeed, the court of appeals indicated that this fact was crucial to its finding of insufficient prejudice: "Then too, the testimony did not reveal the nature of Curley's [the polygra-

pher's] questions or of Tyler's answers. So there was nothing to indicate to the jury what particular statements Curley had reference to when he told Tyler there were indications he was lying." 193 F.2d at 31.

In *Hall*, the government also only introduced testimony indicating that the defendant had failed a polygraph; the specific questions and answers were not told to the jury. 805 F.2d at 1415. While in *Kampiles* and *Johnson* no polygraph testimony was ultimately introduced (because the defendant did not raise the issue that would have permitted it to come in), there is nothing in either opinion to suggest that the court would have permitted an indiscriminate introduction of polygraph testimony.

■ By contrast, in the trial below, the prosecution questioned each of two witnesses concerning the specific questions Miller was asked and the answers he gave. The prosecution thus effectively introduced a thorough account of Miller's polygraph examinations. Unlike the earlier cases, the admission of polygraph evidence in this case was not narrowly tailored to limit the prejudicial effect of such evidence. The jury here was exposed to the full prejudicial impact of Miller's polygraph examinations, an impact that clearly outweighed the probative value of the admitted testimony, even considering the limited purpose for which it was introduced. The operative fact the government sought to establish through the polygraph evidence was that Miller's admissions were reliable because he decided to make them only after being told that he had failed the polygraph. As in *Tyler*, this fact could have been established without revealing the specific questions and answers given during the examinations. Compared to the overwhelming potential prejudice, the marginal probative value of this additional detailed testimony was slight indeed. We hold that the district court abused its discretion in admitting this testimony.

---

**2.** Miller seeks to distinguish the *Tyler–Kampiles–Johnson* line of cases by arguing that they dealt with "voluntariness," while this case deals with "reliability." Because, as set forth below, we conclude that the scope of the polygraph testimony admitted at Miller's trial was improper under these cases in any event, we need not decide whether Miller's proposed distinction has any merit.

■ Given that the admission of this evidence was erroneous, we must consider whether it resulted in substantial prejudice to Miller's rights. *See* Fed.R.Crim.P. 52(a). Nonconstitutional errors do not require reversal unless, viewing the evidence as a whole, it was more probable than not that the errors affected the verdict. *United States v. Soulard,* 730 F.2d 1292, 1296 (9th Cir.1984). We must therefore evaluate the potential prejudicial impact of the admitted testimony on the evidence that was presented to the jury. The prejudicial impact of the polygraph evidence would be to convince the jury unduly that Miller's answers during the polygraph examinations were false, and *a fortiori* that his admissions were true. Since Miller's admissions were at the heart of the prosecution's case, we conclude that it is more likely than not that the jury's verdict was affected by the introduction of the polygraph evidence. Accordingly, Miller's conviction must be reversed.

■ Our conclusion is not altered by the fact that the trial judge in this case gave the jury a limiting instruction on the use of the polygraph testimony. We have previously noted that limiting instructions are not always sufficient to cure the effect of potential prejudice. *See United States v. Prescott,* 581 F.2d 1343, 1352 (9th Cir.1978) ("When [the facts in issue] are so readily subject to misinterpretation by a jury ... a curative or protective instruction [is] of dubious value."); *see also Bruton v. United States,* 391 U.S. 123, 129–35, 88 S.Ct. 1620, 1624–27, 20 L.Ed.2d 476 (1968). Indeed, the Fourth Circuit has held that a limiting instruction is not sufficient to cure the admission of prejudicial polygraph evidence where (1) an inference concerning the result of the exam may be critical to assessing the credibility of the person tested, and (2) that person's credibility is vital to the case. *See United States v. Brevard,* 739 F.2d 180, 182 (4th Cir.1984). In light of our conclusion that the polygraph evidence may have prejudicially affected the jury's consideration of the important issue of the validity and reliability of Miller's admissions, *Brevard* supports our conclusion

that the limiting instruction was insufficient to cure the prejudice to Miller.

*2. The Exclusion of Interrogation Period State–of–Mind Evidence.*

We review the district court's decisions to admit and exclude evidence under Fed.R. Evid. 803(3) for an abuse of discretion. *United States v. Ponticelli,* 622 F.2d 985, 991 (9th Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980), *overruled on other grounds, United States v. De Bright,* 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc).

a. Miller's discussion with Agent Christiansen.

Miller claims that the trial court erroneously excluded a statement he made to Christiansen while Christiansen was driving him home on October 1. Earlier that day, Miller admitted to Minor that he had given Svetlana a classified document. This interview with Minor ended at about 5:15 PM. At that time, Miller was interviewed by Agents Van Note and Torrence for an additional two hours. Miller told them that he had shown Svetlana a classified document at his Los Angeles residence. At the conclusion of this interview, Miller's supervisor, Christiansen, drove him home. Christiansen had already learned about the admission Miller had made to Minor. During the drive, Christiansen asked Miller whether and why he had told Minor that he had passed documents. In his initial report to Christiansen, Miller had not mentioned passing any documents. Miller responded that he was unsure whether the admission reflected something he had actually done or what the interrogators told him he had done.

Miller sought to introduce this statement to show that his admission to Minor was unreliable. Miller argues essentially that the statement tends to show that he was confused and worn down by his interrogators, and that this explains why he admitted to Minor that he had given the PIRG to Svetlana, after having denied any such action for 4 days. Miller argues that the statement to Christiansen is more reliable

than his admission to Minor because Christiansen was Miller's friend, a member of Miller's church, and the person assigned by the FBI to be a sounding board during the interrogation period.

The court excluded the statement to Christiansen because it reflected Miller's then existing state of mind as to a past fact (the admission to Minor) rather than as to a present fact. Miller contests this ruling, arguing that the statement to Christiansen was "critically important" to the issue of "Miller's state of mind during the interrogation period" and was "inherently reliable" since he claims it was spontaneously made and was elicited by Christiansen, rather than volunteered by Miller. Miller also argues that his statement to Christiansen was relevant to his "*then* existing state of mind" as well as his state of mind when he later made further admissions. The government argues that, since the initial admission to Minor was made two hours before the statement to Christiansen, the statement clearly reflected Miller's belief as to a past fact.

■ Federal Rule of Evidence 803(3) provides that the hearsay rule does not exclude:

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed....

"This court has identified three factors bearing on the 'foundational inquiry on admissibility' under Rule 803(3): contemporaneousness, chance for reflection, and relevance." *United States v. Emmert*, 829 F.2d 805, 809–10 (9th Cir.1987) (quoting *Ponticelli*, 622 F.2d at 991). The key issue here is Miller's opportunity for reflection. The trial court was concerned that Miller had had a chance to reflect on his admission to Minor by the time he spoke to Christiansen. The rationale of the hearsay exception in Rule 803(3) is that "the declarant presumably has no chance for reflection and therefore for misrepresentation." *Ponticelli*, 622 F.2d at 991. Here, at least

two hours elapsed before Miller made his statement to Christiansen. In his opening brief to this court the defendant repeatedly asserted, inexplicably, that the statement was made "minutes" after the admission to Minor. The defendant now concedes that there was a lapse of two hours, but argues that this should not matter because the intervening time was mostly filled by an additional interview with other agents. This argument is without merit. The trial court did not abuse its discretion in determining that Miller had had a sufficient opportunity to fabricate the explanation to Christiansen, and that the statement therefore did not fall within the Rule 803(3) exception to the hearsay rule. Miller's reliance upon *United States v. Taglione*, 546 F.2d 194 (5th Cir.1977), and *United States v. Harris*, 733 F.2d 994 (2d Cir.1984), is misplaced. Both cases involved statements concerning the defendant's *present* state of mind, not a belief about a past action.

■ Miller also argues that his statement to Christiansen was relevant to his "*then* existing state of mind." While this may be true, we nonetheless hold that the trial court did not abuse its discretion in excluding the statement. When considered for this purpose, the statement is of only limited probative value to the issues involved in this case. Miller's state of mind at the time he spoke to Christiansen is not itself relevant; it has probative value only insofar as it tells us something about his state of mind *at the time he made the admissions.* Of course, Rule 803(3) bars any use of the content of Miller's statement to Christiansen as a means of directly proving Miller's state of mind at the time he made the admissions. *See* Fed.R.Evid. 803(3) (barring as hearsay "a statement of memory or belief to prove the fact remembered or believed ..."); *see also* 4 J. Weinstein, *Evidence* § 803(3)[02], at 803–110 (1984) ("A statement offered to prove declarant's then existing state of mind as the basis for an inference that he had previously acted in a particular way is hearsay."). Therefore, the only conceivable legitimate probative value that Miller's statement to Christiansen might have is that it serves to show that Miller was distraught and con-

fused at the time he spoke to Christiansen, and that one might infer from this that Miller was similarly confused when he made the admissions. However, the trial court did not abuse its discretion in concluding that evidence on this point was cumulative inasmuch as it admitted into evidence Miller's other statements to Christiansen that he was tired and frustrated. Thus, it was within the trial court's discretion to conclude that whatever additional probative value Miller's comment to Christiansen may have had was outweighed by the danger that the jury would be exposed to a statement that, if considered for its content, would be inadmissible hearsay.[3]

██ Lastly, Miller argues that, regardless of whether it was proper to exclude his statement to Christiansen, the prosecution improperly and repeatedly stated during closing argument that Miller did not at any point during his interrogations retract his earlier admissions. Miller contends that his statement to Christiansen was in fact such an instance in which he told an FBI interrogator that he was uncertain about his prior admission. While the prosecution may be technically correct that Miller never expressly "retracted" his admissions at any point during the interview, the prosecutor's comments during closing argument that Miller "had opportunities" to express any "doubt in his mind" concerning his admissions, but that he failed to do so, was potentially misleading. However, we conclude that any error was harmless in light of the fact that evidence was admitted to the effect that Miller was willing to sign and admit "anything," and that evidence was introduced concerning Miller's alleged mental, physical, and emotional fatigue.

b. Miller's discussion with his wife.

Miller also contests the exclusion of statements he made to his wife during a telephone conversation on the morning of October 2, 1984. Miller wanted to introduce a tape of the conversation, which had been recorded by the government using a telephone tap. Miller argued that he was not offering the tape for the truth of the matters asserted in it, but only to establish his deteriorating mental, physical, and emotional condition during the latter part of the interrogation. Miller discusses his uncertainty about his admissions with his wife and speaks of his confused, distraught state. The court excluded the tape because it was self-serving. The district court found that this was not reliable evidence because Miller had had time to manufacture the contents of the conversation as well as his demeanor, and because he knew that the FBI was monitoring the conversation.

██ The bulk of the statements contained in the tape relate to Miller's beliefs about his previous conduct during the interrogations. As such, they are properly excludable as hearsay under Rule 803(3). However, Miller argues that the tape is not hearsay at all because it was not offered for the truth of the matters asserted, but only to show Miller's distraught state. Assuming this to be true, we conclude that the tape was still properly excluded. The probative value of the tape for this purpose is very low considering its unreliable and self-serving nature. The district court properly noted that Miller had had time to manufacture both the content of, and his demeanor during, the conversation. The phone call occurred, not during the interrogations, but on the morning of October 2, after Miller had had a night's rest from the interviews and several hours before they were scheduled to resume. Furthermore, Miller knew that his phone was being tapped and, indeed, he mentioned to his wife during the phone call that the government was listening. Given the potentially manufactured nature of this evidence, the district court properly recognized that the tape was unreliable and of little probative value. Indeed, what little probative value the tape has in showing Miller's mental state is clearly outweighed by the danger

---

3. For similar reasons, we also reject Miller's suggestion that the statement could be used to prove Miller's state of mind during interrogations that took place on later days. Furthermore, we also note that, as a threshold matter, Miller's state of mind on a previous day has much less, if any, probative force in showing what his state of mind was several days later.

that the jury will be confused or misled by the introduction of these statements, which, if considered for their content, are clearly hearsay. The district court was correct in excluding this tape.

### 3. The Exclusion of the FBI Operating Manual.

We review the district court's decision to exclude evidence of bias for abuse of discretion. *United States v. Ray*, 731 F.2d 1361, 1364 (9th Cir.1984). We reverse if the jury did not have sufficient information to evaluate the bias of a crucial government witness. *Id.* at 1364–65.

■ Miller claims that the court erred in excluding the FBI's Manual of Administrative Operations and Procedures ("MAOP"). The MAOP contains procedures governing FBI interrogations of its employees suspected of criminal wrongdoing. Miller claims that the FBI agents who interrogated him violated its provisions by: (1) not advising him of the charges against him; (2) not recording his statements verbatim; (3) examining him for lengthy periods; and (4) violating polygraph procedures. Miller claims that the jury should have considered such evidence as evidence of bias. The district court ruled that the MAOP was not relevant because the MAOP was not applicable to Miller's investigation.

We need not decide whether the district court was correct in concluding that the MAOP did not apply to the investigation of Miller. Even if the MAOP did apply, it was not an abuse of discretion to exclude it. The fact that the procedures used may have been technical violations of the MAOP is at best weak evidence of bias. On cross-examination, Miller extensively explored the failure of his interrogators to record his statements verbatim, their failure to tell Miller that he was going to be prosecuted for his activities, and the length and intensity of the interrogation periods. Given that Miller thus extensively explored the quality of the investigation and the possible bias that it may indicate, the marginal probative value of the fact that the MAOP may technically have been violated is slight. Whatever value it has is out-

weighed by its potential for confusing the jury and wasting the court's time. *See* Fed.R.Evid. 403.

### 4. The Admission and Exclusion of Expert Testimony.

We review the district court's decisions to admit or exclude expert testimony for abuse of discretion and reverse only for manifest error. *United States v. Christophe*, 833 F.2d 1296, 1299 (9th Cir.1987).

#### a. Defense psychiatric witness.

Miller claims that the district court erred in refusing to admit the testimony of David Lykken, a professor of psychology. Lykken's testimony concerned the psychological impact of being told that one has failed a polygraph exam. Lykken planned to discuss the incentives people have to make damaging admissions after being told they have failed such tests. Lykken offered to testify, for example, that people may change their answers in order to please the interrogators. The court excluded Lykken's testimony because it concluded that he was not qualified as an expert, that his testimony would not be helpful to the jury, and that the probative value of his testimony would be outweighed by its prejudicial effect. The court emphasized that he was not qualified as an expert on false confessions. During voir dire, Lykken discussed only generalities and admitted that he had not conducted any studies on the subject and that he knew of few actual cases of false confessions.

Federal Rule of Evidence 702 provides that expert testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." This circuit has set out four criteria to help evaluate admissibility: "(1) qualified expert; (2) proper subject; (3) conformity to a generally accepted explanatory theory; and (4) probative value compared to prejudicial effect." *Christophe*, 833 F.2d at 1299 (quoting *United States v. Amaral*, 488 F.2d 1148, 1153 (9th Cir. 1973)).

The district court did not abuse its discretion by excluding Lykken's testimony. The court had ample grounds for concluding that Lykken was not qualified as an expert on the subject for which he was to testify. Furthermore, the jury was adequately equipped to comprehend and evaluate Miller's claim that the experience of being told that he had failed a polygraph was a psychologically devastating experience. *Cf. Amaral,* 488 F.2d at 1153 (expert testimony concerning eyewitness reliability was properly excluded since the jury is "superbly equipped" to evaluate the reliability of eyewitness testimony). Lastly, Lykken's testimony consisted of generalities which he did not intend to apply directly to Miller's situation. The trial court was within its discretion in holding that such generalities would not be of appreciable help to the jury. *See United States v. Hsieh Hui Mei Chen,* 754 F.2d 817, 823 (9th Cir.), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985).

b. Government Soviet intelligence witness.

Miller next contests the court's admission of John Barron's testimony to corroborate the government's theory that the Soviets had successfully recruited Miller. Barron testified as an expert in KGB recruitment tactics. Among other things, he testified as to several different factors that the KGB would consider in evaluating a potential recruit. Specifically, Barron testified that the KGB targets people who are ideologically sympathetic to the Soviet Union or who exhibit some personal weaknesses or character defects that the KGB believes it can exploit. Among these "personal weaknesses," Barron testified that the KGB looks for people who are socially isolated, frustrated in their careers, or who have shown themselves to be dishonest or sexually promiscuous. Barron emphasized that "no one of these conditions is in and of itself precisely necessary, ... [but] if you find them in combination, then it may mean

that there is something that [the Soviets] can exploit." Barron testified that the Soviets are always looking for such weaknesses among Westerners with access to classified information. Barron then described some of the methods by which the Soviets would seek to recruit an identified potential target. Since evidence of Miller's financial problems, adultery, job dissatisfaction, and prior dishonesties were admitted into evidence, the prosecution was able to argue that the Soviets had targeted Miller, and based upon other evidence that was admitted, the prosecution argued that Miller's dealings with the Soviets indicated that he had been successfully recruited.

The government argues that Barron's testimony was properly admitted inasmuch as it was introduced solely for the purpose of showing that the KGB targeted Miller, and not for the purpose of arguing that Miller was the type of person who was likely to engage in espionage. However, an examination of the record reveals that the manner in which the government used Barron's testimony was not as carefully limited as the government now claims. The prosecution repeatedly referred to Barron's testimony during closing argument in a manner that invited the jury to use the testimony as character evidence. Thus, the prosecution argued that "Miller was vulnerable to recruitment" and that he had "susceptibilities" and "vulnerabilities" that "formed his motive in this case." The government thus clearly invited the jury to use Barron's testimony as character evidence. Under these circumstances, the government maximized the prejudice to Miller. We therefore conclude that Barron's testimony was improperly used as character evidence.[4]

c. Defense Soviet intelligence witness.

Miller sought to admit the testimony of Colonel William Kennedy to counter Barron's testimony on Soviet recruitment. Kennedy planned to testify that Miller was not likely "targeted" by the KGB; rather

4. Given that the government in this case highlighted the prejudice to Miller, we need not and do not decide whether Barron's testimony concerning the KGB recruitment profile would be admissible for the more limited purpose of showing that Miller was targeted by the KGB.

the KGB merely discovered a "target of opportunity." Miller argues that this is consistent with his theory that he sought to be recruited by the Soviets in order to ensnare KGB personnel. The government argued that Kennedy was not an expert in KGB recruitment tactics, and the district court agreed. The district court did not abuse its discretion in excluding this testimony. The court had sufficient grounds for concluding that Kennedy was not qualified as an expert on KGB recruitment tactics. Kennedy lacked significant practical experience in the field and had not made any special study of the subject. Accordingly, this testimony was properly excluded.

### 5. The Admission of Prior Misconduct Evidence.

We reverse a court's admission of evidence under Fed.R.Evid. 404(b) only for a clear abuse of discretion. *United States v. Ford*, 632 F.2d 1354, 1375 (9th Cir.1980), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981), *overruled on other grounds, United States v. De Bright*, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc).

Miller argues that the district court erred in admitting evidence of his secret 1982 arrangement with Larry Grayson. Miller provided Grayson, an FBI informant, with DMV records in exchange for small amounts of money. Miller was charged with bribery because of this arrangement, but the court severed the bribery counts from the espionage counts. At that time, the court reserved ruling on whether the arrangement would be admissible under Rule 404(b) on the espionage counts.

At trial, the court admitted the evidence to show Miller's intent in soliciting the $15,000 cash and $50,000 in gold from Svetlana. Miller argued that he did not intend to exchange documents for the benefit of the Soviet Union, but was merely "playing along" to ensnare some KGB personnel. He argues that the fact that he sold information to Grayson is only helpful if it is

viewed as establishing a "propensity" on Miller's part to engage in such behavior and that this constitutes impermissible character evidence. The government responds that the fact that Miller had earlier accepted payment from Grayson made it more probable that he had a criminal intent in soliciting money from the Soviets.

We have long held that under Rule 404(b) evidence of other crimes or wrongs is inadmissible where "its only relevance is to show criminal disposition." *United States v. Lewis*, 837 F.2d 415, 419 (9th Cir.1988); *Ford*, 632 F.2d at 1375. In *United States v. Bailleaux*, 685 F.2d 1105, 1110 (9th Cir. 1982), we outlined a four part test for the admissibility of such evidence under Rule 404(b): "(1) Proof that the defendant committed the other crime must be clear and convincing; (2) the prior criminal conduct must not be too remote in time from the commission of the crime charged; (3) the prior criminal conduct must, in some cases, be similar to the offense charged; and (4) the prior conduct must be introduced to prove an element of the charged offense that is a material issue in the case." *See also United States v. Sarault*, 840 F.2d 1479, 1485 (9th Cir.1988). However, we note that the first of these four factors has been modified by the Supreme Court's decision in *Huddleston v. United States*, —— U.S. ——, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). In *Huddleston*, the Court rejected the Ninth Circuit's "clear and convincing" standard in favor of the more lenient rule that Rule 404(b) evidence may be admitted "if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act." *Id.* The other three factors, however, remain unaffected by the Court's decision in *Huddleston*. We also note that, even if all four of the conditions are met, the evidence may still be excluded under Rule 403 on the grounds that its prejudicial effect outweighs its probative value. *Bailleaux*, 685 F.2d at 1110; *Sarault*, 840 F.2d at 1485.[5]

---

**5.** *Sarault* actually lists this as a requirement for admissibility under Rule 404(b). While the result is the same, we prefer to keep separate the

Rule 403 inquiry, since it is one that applies to *all* evidentiary decisions.

We agree that the prosecution presented sufficient evidence to permit a jury to find that Miller had made the prior sale of information to Grayson. We also agree that, considering the context, two years is not too remote in time to be probative. Nor can we accept Miller's contention that "intent" was not at issue during the trial. Miller argues that because he denies both giving and receiving money from the Soviets, no transaction exists in which his intent needs to be scrutinized. While intent is not the only issue in this case, it is clearly one of the issues. If the government succeeds in persuading the jury that Miller did give a document to the Soviets, then Miller's intent will be the key remaining issue. Furthermore, Miller concedes that he solicited money from the Soviets through Svetlana, and his intent in doing so is clearly at issue. Thus, the first, second, and fourth factors in the *Bailleaux* test are all present.

■ The key issue here is whether Miller's selling information to Grayson is too dissimilar from the activities alleged in this case. We noted in *Bailleaux* that similarity is not always a prerequisite under Rule 404(b). Thus, in cases involving the use of prior crimes to show "opportunity, knowledge, preparation or motive," similarity may or may not be necessary depending upon the circumstances. 685 F.2d at 1110 n. 1. For example, if a person commits a second crime in order to cover up the first, proof of the first crime may be used to show motive for the second even though the crimes are dissimilar. On the other hand, when prior crimes are used to establish "identity, *modus operandi*, or absence of mistake or accident," such evidence simply lacks probative value unless it is sufficiently similar to the subsequent offense. *Id.* This is true because, if the prior act is not similar, it does not tell the jury anything about what the defendant intended to do in his later action—unless, of course, one argues (impermissibly) that the prior act establishes that the defendant has criminal propensities. Thus, our cases have uniformly held that the use of prior acts to prove identity of intent is only permissible if the acts are similar to the crime charged.

*Sarault,* 840 F.2d at 1485–86; *Lewis,* 837 F.2d at 418–19; *United States v. Catabran,* 836 F.2d 453, 459 (9th Cir.1988); *United States v. Hernandez–Miranda,* 601 F.2d 1104, 1108–09 (9th Cir.1979).

We conclude that Miller's activities with Grayson are too dissimilar from most of the offenses charged here to permit these prior acts to serve as valid proof of intent. The offenses with which Miller is charged under 18 U.S.C. §§ 793(b), 794(a) & (c), which relate to copying and delivering defense information to a foreign government, all require that the government prove that the defendant acted with intent or reason to believe that the information transmitted would either injure the United States or benefit a foreign government. The offense charged against Miller under 50 U.S.C. § 783(b), relating to the improper communication of classified information, requires a showing that the defendant knew or had reason to believe that the person to whom he gave such information was either a representative of a foreign government or a member of a Communist organization, and that he knew or had reason to know that the information was classified. The intent required for these offenses is wholly dissimilar from the intent involved in the sale of information to Grayson. The fact that Miller sold DMV records to Grayson does not make it any more likely that he later intended to injure the United States or benefit the Soviet Union. None of the above mentioned offenses requires, as an element of proof, that consideration was sought or received for the information delivered. Since the request for, or payment of, money from the Soviets is not an element of these offenses, Miller's receipt of money from Grayson has no tendency whatsoever to establish any intent required for these offenses.

■ Our conclusion is necessarily different for the charge of bribery. Miller was also charged under 18 U.S.C. § 201, which punishes anyone who "corruptly ... seeks, accepts, receives or agrees to receive anything of value" in return for "being induced to do ... any act in violation of his official duty." Here, the intent required to

establish this offense is identical to that involved in the sale of documents to Grayson, namely the intent to receive value in return for a breach of official duty. Furthermore, the two crimes are sufficiently similar factually to give Miller's solicitation from Grayson probative force in establishing that he intended to enrich himself when he solicited money through Svetlana.

Although Miller's prior solicitation of Grayson would thus have been admissible under Rule 404(b), that does not mean that the evidence was properly received. We find no indication in the record that the jury was in any way instructed that the evidence of this prior offense could only be used with respect to the bribery count.[6] Accordingly, we hold that the evidence of Miller's prior sale of information to Grayson was improperly admitted under Rule 403.

■ The government suggests, as an alternative ground for admitting this evidence, that the evidence concerning Miller's relationship with Grayson was relevant to show Grayson's bias. This evidence, however, has little probative force in establishing Grayson's bias. Although Grayson was called as a defense witness, he was also given immunity by the government, and the defense claims that he was a hostile witness. But even if we concede that the prior conduct testimony was relevant to show Grayson's bias, its probative value is clearly outweighed by the extreme potential for prejudice.

### 6. The Sealed Proceeding.

We review the district court's decision to admit evidence for abuse of discretion, *Polizzi*, 801 F.2d at 1555.

Svetlana testified at Miller's second trial that Miller had never given her or shown her any classified documents. Miller challenges the district court's admission of statements from a sealed transcript which the government used to cross-examine Svetlana. Svetlana and her husband had pleaded guilty in open court on June 26, 1985. During that proceeding, Svetlana's lawyer and the government discussed Svetlana's plea at a sidebar with the court.

Svetlana's lawyer informed the court that she had made a proffer to the government which she did not want to state in open court out of fear for her family's safety in the Soviet Union. The conversation is not detailed, but Svetlana's lawyer informed the court that she had authorized him to say that she had received documents from Miller. At Miller's trial, Svetlana testified that the proffer was made in hopes of leniency in sentencing.[7] At Miller's trial, Svetlana admitted that she had authorized her lawyer to make the statement, but maintained that it was nevertheless false.

Miller charges that the government only used the sidebar proceeding to create a secret cache of evidence with which to impeach Svetlana later. Miller claims that the admission of the sidebar proceedings violated due process and that the initial sealing of the transcript of the sidebar violated the first amendment.[8]

Having concluded that Miller's conviction must be reversed, we believe that no purpose would be served by deciding whether the use of this sealed testimony violated due process or whether the initial decision to seal the transcript violated Miller's first amendment right of access. In some instances, when we conclude that a conviction must be reversed, we examine all the points raised on appeal so that any errors will not be repeated at the next trial. Here, however, it is clear that these errors

---

6. The government asserts in its brief that the evidence was offered solely with respect to the charge of soliciting bribes, but the limiting instruction given to the jury by the court reveals no such limitation.

7. Indeed, soon after the sidebar proceeding, Svetlana's attorney moved unsuccessfully for a reduction in sentence under Fed.R.Crim.P. 35.

8. Miller does not claim that the government had a duty to turn this material over to the defense. The contents of the sidebar do not fall within any of the categories of discoverable material listed in Fed.R.Crim.P. 16. Miller conceded that the government had no duty under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Jencks Act is not applicable because Svetlana was called as a defense witness. 18 U.S.C. § 3500 (1982).

cannot recur at the new trial of Miller. Since Miller now has a complete transcript of the sidebar, he will suffer no surprise if Svetlana testifies and is impeached by the sidebar at the new trial. Similarly, now that Miller has "access" to what transpired at the sidebar, any violation of his first amendment rights that may have occurred has now been remedied. Since these issues are thus thoroughly mooted by our decision to reverse Miller's conviction, we will not address them on this appeal.

However, Miller does raise a final objection to this testimony that must be addressed since it remains a potential issue at the retrial. Miller argues, essentially, that the government had no prior inconsistent statement with which to impeach Svetlana. The defense asserts that the proffer made at the sidebar by Svetlana's attorney cannot be considered Svetlana's statement, and that any statement that Svetlana made authorizing her attorney to make the proffer is covered by the attorney-client privilege. Accordingly, argues Miller, there simply was no statement of Svetlana's for the government to use for impeachment.

■■■ The record below clearly indicates that the government sought to impeach Svetlana with the prior statements she made to her attorneys; the sidebar was only introduced to support the fact that she had authorized them to make the proffer. Thus, for example, the government led up to the introduction of the sidebar with the following question to Svetlana: "One of the things that you told your attorneys that they should tell the judge was that Miller had passed documents to you, did you not?" Miller claims that, when Svetlana was questioned at Miller's trial, her attorney (Mr. Brian) was emphatic in not waiving any portion of the attorney-client privilege and that Svetlana's statement authorizing the proffer is therefore privileged. While it is true that Mr. Brian assiduously sought to protect the attorney-client privilege, he also stated that he did not believe that Svetlana's authorization of

the proffer fell within the scope of the attorney-client privilege: "If a client authorizes an attorney to make representations to the court or to any third party, the statement is not intended to be confidential [and] therefore is not covered by the attorney/client privilege...." In light of Mr. Brian's own statement, we conclude that Svetlana's authorization was not intended to be confidential and was thus not subject to the attorney-client privilege. Accordingly, Svetlana may be impeached by evidence tending to show that she made such an authorization.[9]

### 7. The Prior Statements.

We review the admission of a witness' prior statements under Fed.R.Evid. 801(d)(1)(B) for abuse of discretion. *See Breneman v. Kennecott Corp.*, 799 F.2d 470, 472–73 (9th Cir.1986).

#### a. Svetlana's.

Svetlana testified that she and Miller attempted to penetrate the KGB on behalf of the FBI. After the government had used the sidebar to impeach Svetlana's testimony that Miller had never shown nor given her a classified document, Miller sought to introduce seven prior statements of Svetlana to rehabilitate her.

Federal Rule of Evidence 801(d)(1)(B) provides that prior statements are admissible if they are (1) consistent with a witness' trial testimony and (2) offered to rebut a charge of recent fabrication or improper influence or motive. In this circuit, rehabilitative prior statements are admissible as substantive evidence under Rule 801(d)(1)(B) only if they were made before the witness had a motive to fabricate. *Breneman*, 799 F.2d at 473; *United States v. Rohrer*, 708 F.2d 429, 433 & n. 4 (9th Cir.1983); *United States v. Rodriguez*, 452 F.2d 1146, 1148 (9th Cir.1972). The district court refused to admit Svetlana's prior statements because they were all made after her arrest, a time when she clearly had

---

**9.** We also note that Svetlana's statement to her attorney authorizing the proffer is not hearsay. The statement is offered only for impeachment, and not for the truth of the matter asserted.

*See United States v. Winkle*, 587 F.2d 705, 710 (5th Cir.), *cert. denied*, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979); *United States v. Sisto*, 534 F.2d 616, 622–23 (5th Cir.1976).

a motive to fabricate. Miller argues that this decision was incorrect because, even if the statements were inadmissible as *substantive* evidence under Rule 801(d)(1)(B), they should have been admitted for the limited purpose of rehabilitating the witness' impeached credibility. When introduced for that limited purpose, argues Miller, the statements are not hearsay because they are not being offered for the truth of the matter asserted. The government responds by arguing that the requirement of no motive to fabricate applies regardless of whether the statements are being introduced only for a limited purpose.

 We begin by noting that at least two circuits have indeed held that the requirement that there be no motive to fabricate does not apply when the prior consistent statement has been offered solely for rehabilitation and not as substantive evidence. *See United States v. Brennan*, 798 F.2d 581, 587–88 (2d Cir.1986); *United States v. Harris*, 761 F.2d 394, 398–400 (7th Cir.1985).[10] In order to decide whether we will follow this rule, we must first examine both the purpose of the requirement that there be no motive to fabricate and the nature of the requirement.

The court in *Harris* stated that the reason for the requirement is that, unless there was no motive to fabricate, the prior consistent statement has little probative value. Thus, the court stated:

> [E]vidence which merely shows that the declarant said the same thing at trial as he did on a prior occasion is of no probative value to rebut an allegation of recent fabrication when the declarant's motive in making both statements was the

same[,] for the simple reason that mere repetition does not imply veracity.

*Harris*, 761 F.2d at 399. Thus, contrary to the suggestion in *Brennan, see* 798 F.2d at 587, the requirement of no motivation to fabricate does *not* arise from anything in the literal terms of Rule 801(d)(1)(B); rather, the requirement emerges from relevancy concerns under Rules 402 and 403. *See Harris*, 761 F.2d at 399 ("[A]lthough a prior consistent statement may meet the literal requirements of Rule 801(d)(1)(B), it may nonetheless be inadmissible for failure to meet the relevancy requirement of Rule 402."). However, after concluding that the requirement is not based on the terms of Rule 801(d)(1)(B), *Harris* inexplicably goes on to conclude that the requirement applies only in cases where the evidence is offered as substantive evidence under Rule 801(d)(1)(B). *Id.* at 400.

We reject the distinction drawn in both *Harris* and *Brennan*. We do so for two reasons. First, since the requirement of no prior motive to fabricate is rooted in Rules 402 and 403, and not in the terms of Rule 801(d)(1)(B), there is no basis for limiting the requirement to cases involving prior statements under Rule 801(d)(1)(B). Indeed, we fail to see how a statement that has no probative value in rebutting a charge of "recent fabrication or improper influence or motive," *see* Fed.R.Evid. 801(d)(1)(B), could possibly have probative value for the assertedly more "limited" purpose of rehabilitating a witness. If "repetition does not imply veracity," *see Harris*, 761 F.2d at 399, then proof of repetition cannot rehabilitate.

---

**10.** Both *Brennan* and *Harris* cite several other cases as making this distinction. *See Brennan*, 798 F.2d at 588 (citing *United States v. Parodi*, 703 F.2d 768, 784–87 (4th Cir.1983)); *Harris*, 761 F.2d at 399 (citing *Parodi; United States v. Parry*, 649 F.2d 292, 296 (5th Cir. Unit B June 1981); *United States v. Scholle*, 553 F.2d 1109, 1121–22 (8th Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977)). However, close examination of these cases reveals that they do *not* draw any distinction based on the purpose for which a prior consistent statement is offered. Rather, these cases reject *entirely* the requirement that there have been no motive to fabricate. (*Scholle*, however, was later read as

not even standing for this proposition. In *United States v. Bowman*, 798 F.2d 333, 338 & n. 2 (8th Cir.1986), *cert. denied*, 479 U.S. 1043, 107 S.Ct. 906, 93 L.Ed.2d 856 (1987), the Eighth Circuit distinguished *Scholle* and agreed with the Ninth Circuit rule, holding that there must be no motive to fabricate.) Given that these other circuits do not even impose a requirement of no motive to falsify even when admission is sought under Rule 801(d)(1)(B), they clearly do not have to face the question whether such a requirement should be imposed when the evidence is offered for assertedly more limited purposes.

Second, the distinction drawn by *Harris* and *Brennan* is inconsistent with the legislative history of Rule 801(d)(1)(B). Prior to the adoption of Rule 801(d)(1)(B), prior consistent statements were traditionally only admissible for the limited purpose of rebutting a charge of recent fabrication or improper influence or motive. *See* Fed.R. Evid. 801(d)(1)(B) advisory committee's notes. The Rule goes one step further than the common law and admits all such statements as substantive evidence. *Id.* The Rule thus does not change the type of statements that may be admitted; its only effect is to admit these statements as *substantive* evidence rather than solely for the purpose of rehabilitation.[11] Accordingly, it no longer makes sense to speak of a prior consistent statement as being offered solely for the more limited purpose of rehabilitating a witness; any such statement is admissible as *substantive* evidence under Rule 801(d)(1)(B).[12] In short, a prior consistent statement offered for rehabilitation is either admissible under Rule 801(d)(1)(B) or it is not admissible at all. The distinction drawn by *Brennan* and *Harris* is therefore untenable.

This does not imply that we disagree with the result in either *Brennan* or *Harris.* Although we do not believe that prior consistent statements may be admitted for rehabilitation apart from Rule 801(d)(1)(B),

we do not agree with the very strict manner in which those cases apply the requirement of no motive to fabricate. Indeed, the *Harris* and *Brennan* courts seem to have created an end run around Rule 801(d)(1)(B) in order to blunt the apparent harshness of the requirement. For example, in *Brennan,* the Second Circuit first concluded that the prior consistent statements made by a government witness (Mr. Bruno) before a grand jury were inadmissible under Rule 801(d)(1)(B) because Mr. Bruno's fear of prosecution gave him a reason to fabricate. 798 F.2d at 587. The court then went on to conclude, however, that the statements were admissible for the limited purpose of rehabilitation. Bruno had been impeached with other statements he made during his grand jury testimony, and the court therefore concluded that the consistent statements were admissible because they helped to "amplif[y] and clarif[y]" the alleged inconsistent statements, and because they helped to "cast doubt ... on whether the impeaching statement[s] [were] really inconsistent with the trial testimony." 798 F.2d at 589. *See also Harris,* 761 F.2d at 400 (despite presence of motive to fabricate, which barred admission under Rule 801(d)(1)(B), government was permitted to rehabilitate witness with consistent statements made during same interview as allegedly inconsistent ones; state-

---

**11.** *See* 4 D. Louisell & C. Muller, *Federal Evidence* § 420 at 195 (1980) ("[T]he drafters believed (i) that the principles governing rehabilitation would remain unchanged by the Rules, (ii) that the rather specific description of circumstances of admissibility contained in Rule 801(d)(1)(B) reaches all cases in which prior consistent statements may be received to repair credibility, and consequently (iii) that this Rule permits the substantive use of every prior statement which may be received to rehabilitate a witness.").

**12.** In his concurring opinion in *United States v. Rubin,* 609 F.2d 51, 69–70 (2d Cir.1979), *aff'd on other grounds,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981), Judge Friendly vigorously argued against this proposition. His argument assumes that there is a class of prior consistent statements that is admissible for rehabilitation and yet not admitted as substantive evidence under Rule 801(d)(1)(B). Thus, he argues that Rule 801(d)(1)(B) only sought to admit as substantive evidence a certain limited class of state-

ments that had been "traditionally" admitted for rehabilitation. 609 F.2d at 69 (quoting Fed.R. Evid. 801(d)(1)(B) advisory committee's notes). We do not agree. It is hard to see how a statement can be offered for purposes of rehabilitation and yet not be offered for the purpose of rebutting a charge of recent fabrication or improper influence or motive. There is thus no class of prior consistent statements, offered for purposes of rehabilitation, that does not fall within the literal scope of Rule 801(d)(1)(B). Judge Friendly's opinion seems to be concerned primarily about the fact that if one were to apply the no-motive-to-fabricate requirement to all prior consistent statements in as strict a manner as it has been applied by the Second Circuit to those statements admitted under Rule 801(d)(1)(B), then a considerable amount of probative testimony will be excluded. As noted below, we share this concern, but we believe that the solution lies, not in drawing an untenable limit on Rule 801(d)(1)(B), but in applying the requirement in a manner that is less strict and less mechanical.

ments were relevant to "whether the impeaching statements really were inconsistent within the context of the interview"); *United States v. Pierre*, 781 F.2d 329, 333 (2d Cir.1986) (Prior consistent statement that is inadmissible as substantive evidence under Rule 801(d)(1)(B) is admissible for limited purpose of rehabilitation where it "tends to cast doubt on whether the prior inconsistent statement was made or on whether the impeaching statement is really inconsistent with the trial testimony" or where it "will amplify or clarify the allegedly inconsistent statement.").

We believe that these cases interpret the requirement of no motive to fabricate too strictly. The requirement should not be applied as a rigid *per se* rule barring all such prior consistent statements under Rule 801(d)(1)(B), without regard to other surrounding circumstances that may give them significant probative value. Indeed, our conclusion that the requirement emerges from the relevancy concerns of Rules 402 and 403 implies that trial judges should consider motivation to fabricate as simply one of several factors to be considered in determining relevancy—albeit a very crucial factor. Thus, the trial judge must evaluate whether, in light of the potentially powerful motive to fabricate, the prior consistent statement has significant "probative force bearing on credibility apart from mere repetition." *Pierre*, 781 F.2d at 333. This determination rests in the trial judge's sound discretion.[13]

 We can now apply these principles to the case before us. The seven prior statements of Svetlana that Miller offered for rehabilitation were all made during the period Svetlana was under criminal investigation or indictment. Svetlana thus had a powerful motive to fabricate exculpatory testimony, and there is nothing in the

record to suggest that the statements have any "probative force bearing on credibility apart from mere repetition." *Pierre*, 781 F.2d at 333. Indeed, closer examination of the statements merely confirms the correctness of the district court's decision. All of the statements were made either to federal agents or to defense attorneys, thus heightening the suspicion that the statements are too self-serving to have any significant probative value.

Svetlana's prior statements in no way help to explain or amplify the inconsistent statement with which she was impeached, and since Svetlana admitted to making the inconsistent statement, the prior statements obviously do not cast any doubt on whether the inconsistent statement was made. The district court was correct in excluding these statements.

Miller also offered several other prior statements of Svetlana that did not directly deal with the issue of the passage of documents. The court excluded some of these statements because it concluded that they did not corroborate her testimony on direct examination. For example, Svetlana initially denied any involvement with Soviet intelligence and insisted that she and Miller were mere friends; at trial, she testified that she and Miller had worked together to ensnare the KGB. Other statements that were offered did not concern matters on which Svetlana had been impeached. The decision to exclude such statements on these grounds was clearly within the trial court's discretion.

b. Marta York's.

 The government called Marta York to testify. York and Miller had been lovers, and she visited Miller in Los Angeles in September 1984. She returned to her home

---

**13.** These conclusions are consistent with the case law of this circuit. Although in *Rohrer* we rejected the argument that prior motive to fabricate determines "only the weight of the statement" rather than its admissibility, *see* 708 F.2d at 433 n. 4, nothing in *Rohrer* or our other opinions requires that motive to fabricate be given *conclusive* weight in determining admissibility. To the extent that our prior opinions appear to reflect the rigid *per se* rule we reject,

this was a consequence of the fact that the prior consistent statements in those cases had no significant probative value apart from mere repetition. Accordingly, the admissibility of those statements hinged solely on the issue of motive to fabricate, and the court was never confronted with the question whether a prior consistent statement might, in some cases, have significant probative value despite the presence of a motive to fabricate.

in Portland several days later. On October 2, 1984, during his interrogation, Miller called York to warn her that the FBI might be contacting her.

York testified that Miller told her during that conversation that he had given one classified document to his Soviet girlfriend and that he had received a "good deal." On cross-examination, the defense showed that, in numerous FBI interviews, York had denied that Miller said he had given the Soviets any documents. The district court allowed the government to rehabilitate York by introducing testimony concerning statements York had made immediately after Miller's phone call. Gary Allan, a social worker present in York's home during the call, testified that York told him Miller said he had passed one document.

The court allowed the statement because it was spontaneous and made before any motive to fabricate arose. Miller contends that York had motives to fabricate before she made her statement to Allan. He maintains that York had reason to fabricate the statement because she was upset and resentful about her broken love affair with Miller. (Miller had decided to become reconciled with his wife and had told York that he had been seeing a third woman (Svetlana) in Los Angeles during September 1984.) At trial, York maintained that she was reluctant to cooperate with the FBI in earlier interviews because she still loved Miller and did not want to provide information against him. The government thus contends that York's only motive was to protect Miller.

In deciding whether the district court abused its discretion in admitting evidence of York's prior consistent statement, we first note that the dangers presented by York's alleged motive to fabricate are very different from those involved in the case of Svetlana. Svetlana made her prior statements during a criminal investigation when she had a strong motive to fabricate exculpatory testimony. Courts are extremely reluctant to admit such testimony for rehabilitation, not only because it is of very low probative value, but also because this meager probative value is clearly outweighed by the danger that criminal suspects will be encouraged to manufacture exculpatory testimony by simply repeating to many people that they are innocent. Accordingly, such testimony is generally not admitted.

The situation with York's statement is very different. Her alleged motive to fabricate is that she was angry at Miller and wanted revenge against him for breaking off their affair. While this may indeed be true and should be argued to the jury, we do not believe that the prior statement was so worthless as to warrant its total exclusion under Rule 402 or Rule 403. While York's alleged motive to lie is not negligible, it is not nearly as strong as the very powerful motive that criminal defendants may feel to give exculpatory testimony. Because her statements were found to be spontaneous, there is little fear that admitting York's statement to Allan will somehow encourage spurned lovers to avenge their broken hearts by manufacturing false inculpatory testimony against their former loves. Accordingly, even if York had a motive to fabricate, we conclude that, given the speculative nature of the motive and the spontaneous nature of York's statement, exclusion would have been inappropriate. It was sufficient in this case that Miller was able to argue to the jury that York might have lied when she made the earlier statement. The district court was therefore correct in admitting Allan's testimony concerning York's prior consistent statement.

## 8. The Exclusion of the Contents of Classified Documents.

We review for abuse of discretion the district court's ruling refusing to admit classified information in the form that Miller had requested. *See United States v. Clegg,* 846 F.2d 1221, 1224 (9th Cir.1988) (*Clegg* II). We review de novo the court's construction of the statute governing disclosure of classified information. *See United States v. Clegg,* 740 F.2d 16, 18 (9th Cir.1984) (*Clegg* I).

During the interrogation period, Miller consented to searches of his two residences

and his work desk. The searches uncovered a number of classified documents. Pursuant to § 5 of the Classified Information Procedures Act (CIPA), 18 U.S.C. App. III (1982), Miller gave advance notice of his intention to introduce all of these documents at trial. His written notice consisted simply of a list indicating the length and title of each document found. Pursuant to § 6 of CIPA, a pretrial hearing was held to determine the "use, relevance, [and] admissibility" of the classified documents Miller sought to introduce. At the hearing, Miller stated that he intended to argue at trial that he was not collecting classified documents in order to pass them to the Soviet Union, but rather that he was a disorganized "pack-rat" who simply failed to properly file all of his documents. He argued that the jury could not evaluate this defense without seeing *all* of the documents, and that therefore all of the classified documents were relevant. The district court agreed that Miller's "pack-rat" theory was a viable defense, but the court did not agree that the entire contents of each and every document were relevant to establishing this defense. Miller argued that it was up to the government to state what portions of the documents should be either deleted altogether or replaced with a substitute summary. The district court disagreed, ruling that the defense first had to establish that all of the material offered was relevant. The court couched this conclusion in terms of the notice requirements of § 5, ruling that Miller's notice was inadequate because it failed to set forth (1) the particular contents of each document and (2) the reasons why each such particular item of classified information was relevant to the defense's case.

■ On appeal, Miller argues that the notice he gave was fully adequate under § 5 of CIPA. We agree. The only language in § 5 concerning the form and content of the required notice is the statement that "[s]uch notice shall include a brief description of the classified information." Miller's notice satisfied the purpose of this requirement inasmuch as it fully alerted the government as to what classified information Miller sought to introduce. The

government knew exactly to which documents Miller was referring, and it knew what information was contained in them. Indeed, we note that the Fourth Circuit has recently ruled that a notice comparable to this one was sufficient under § 5 of CIPA. *See United States v. Zettl*, 835 F.2d 1059, 1064–65 (4th Cir.1987).

■ Although we agree that Miller's notice was sufficient under § 5, that does not imply that the trial court's ruling was erroneous. The trial court ruled that Miller had not demonstrated that all of the documents would be relevant to his defense. This decision was not an abuse of discretion. *See* Fed.R.Evid. 403. In *United States v. Wilson*, 750 F.2d 7, 9 (2d Cir.1984), *cert. denied*, 479 U.S. 839, 107 S.Ct. 143, 93 L.Ed.2d 85 (1986), the defendant was charged with attempting to arrange the assassination of witnesses who were to testify against him at several trials (which ultimately resulted in convictions). The defendant asserted that he simply had no motive to intimidate any of the witnesses at the earlier trials because his prior participation in various covert activities on behalf of the United States led him to believe that he would not be sentenced and imprisoned for any of the offenses at the earlier trials. Wilson therefore sought to introduce various items of evidence concerning his earlier covert activities. The district court ruled that the defendant would be permitted to testify that he worked for various intelligence agencies and was involved in covert activities, but the court refused to permit Wilson to reveal the details of the particular covert actions, concluding that the meager probative value of such evidence was outweighed by its potential to inflame, mislead, or confuse the jury and to waste the court's time. The court of appeals affirmed. Similarly, in this case the district court appropriately ruled that Miller would not be permitted to introduce all of the documents in a wholesale fashion, but rather would be required to specify with greater particularity which documents or portions of documents were relevant. The district court did not abuse its discretion in concluding that Miller had

failed to show that the *contents* of all of these documents were relevant to his defense. Furthermore, introduction of the entire contents of all of these documents might confuse and mislead the jury and waste the court's time.

■ Miller argues that CIPA places the burden on the government to say what documents or portions of documents should be excluded as irrelevant. This is incorrect. Section 6(c) of the Act provides that "[u]pon any determination by the court authorizing the disclosure of specific classified information," the government may move to substitute the classified information with summaries or may simply admit the relevant fact. The plain language of the provision indicates that it is not applicable unless and until the court has first ruled that the classified information is admissible. *See* H.R.Conf.Rep. No. 1436, 96th Cong., 2d Sess. 12, *reprinted in* 1980 U.S.Code Cong. & Admin.News 4294, 4307, 4310 ("There would be a separate hearing on the question of alternative disclosure after rulings on use, relevance or admissibility."). The burden of showing admissibility remained with Miller.

The record indicates that, rather than attempting to make a more narrowly tailored offer of proof, Miller stipulated to the substitute statement offered by the government. This statement consisted of the titles, dates, classification, and length of each document. Miller also attempted to support his "pack-rat" defense by showing the jury the pile of documents found. Because Miller did not make an alternative offer of proof and instead stipulated to the government's statement, the only claim preserved on appeal is Miller's argument that all of the documents should have been admitted. *See United States v. Allison,* 490 F.2d 79 (5th Cir.) (defendant was held to have waived any objection to the *manner* in which the district court admitted certain testimony when the record revealed that, after losing the motion to exclude, the defendant had himself requested the terms

under which the evidence was admitted), *cert. denied,* 419 U.S. 851, 95 S.Ct. 91, 42 L.Ed.2d 82 (1974). Since we reject that claim, we conclude that the district court's handling of this evidence was proper.[14]

*9. The Jury Instructions.*

In reviewing allegedly erroneous jury instructions, we consider whether the instructions, considered as a whole in the context of the trial, were misleading or inadequate to guide the jury's determination. *United States v. Washington,* 819 F.2d 221, 226 (9th Cir.1987). We review the language or formulation of specific instructions only for abuse of discretion. *United States v. Frazin,* 780 F.2d 1461, 1468 (9th Cir.), *cert. denied,* 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 98 (1986).

■ Miller raises three objections to the jury instructions in this case. First, Miller claims that the trial court erroneously instructed the jury concerning the intent required to convict Miller on the espionage-related counts charged under 18 U.S.C. §§ 793(b) & 794(a) and 50 U.S.C. § 783(b). Miller argues that the instructions permitted the jury to convict upon a showing of general intent, rather than the required specific intent. Miller asserts that the government should have been required to show that he acted with "bad faith," i.e. a "purpose either to disobey or to disregard the law."

In order to prove the offenses charged under 18 U.S.C. §§ 793(b) & 794(a), the government must show that Miller intentionally performed the acts charged *and* that he did so with "intent or reason to believe that the information [delivered] is to be used to the injury of the United States, or to the advantage of any foreign government." Contrary to the suggestion of Miller, this showing is all that the Supreme Court required when it stated that a person may not be convicted under these statutes absent a showing of "bad faith."

---

**14.** Miller also points out, correctly, that the district court failed to issue a written order in this matter, as required by § 6(a). However, in light of the fact that the court's oral ruling was

transcribed, we conclude that any error was harmless. *See United States v. Wilson,* 732 F.2d 404, 413 (5th Cir.), *cert. denied,* 469 U.S. 1099, 105 S.Ct. 609, 83 L.Ed.2d 718 (1984).

*See Gorin v. United States,* 312 U.S. 19, 27–28, 61 S.Ct. 429, 433–34, 85 L.Ed. 488 (1941). The district court's instructions accurately described the required intent. The court instructed the jury that Miller could be convicted only if he voluntarily and intentionally committed the acts charged. The court also instructed the jury that it could not convict unless it found that Miller acted with intent or reason to believe that the documents he delivered, if any, would be used to harm the United States or benefit the Soviet Union. Accordingly, the district court properly refused to instruct the jury that it could not convict Miller unless it concluded that he knew that his actions violated the law.[15]

■ Second, Miller challenges the court's denial of an instruction to the effect that the prosecution could not prove an essential element of the crime of bribery merely by the jury's disbelief of Miller's out-of-court denials of guilt. Miller correctly points out that our cases establish, as a general matter, that the government may not seek to prove an element of a charged offense simply by urging the jury to disbelieve the defendant's out-of-court statements. *See, e.g., United States v. Behanna,* 814 F.2d 1318, 1320 (9th Cir.1987). However, we conclude that there was no evidentiary basis in this case for giving the jury an instruction to this effect. The likelihood that the evil which *Behanna* seeks to prevent could occur in this case is, on this record, just too remote to justify the potential confusion the instruction would cause in the minds of the jurors. A *Behanna* problem could only occur in this case if the jury (1) disbelieved all of Miller's *inculpatory* out-of-court statements, (2) disregarded all of the circumstantial evidence indicating that Miller had performed the charged acts, and that he had done so for monetary gain, and (3) then went on to rely

exclusively on disbelief of an exculpatory out-of-court statement in order to find at least one of the essential elements of the crime. We conclude that there was very little, if any, risk that the jury would convict Miller in this way. There was thus no evidentiary basis for giving such an instruction.

Furthermore, the instruction might have carried a significant risk of confusing the jury in this case. The potential for mischief from such an instruction is amply illustrated by the example that Miller gives in his brief, which he claims shows why the instruction was necessary. Miller suggests that it was improper for the prosecution to urge the jury to believe his out-of-court statements that he solicited cash and gold, but to disbelieve his out-of-court statements that the solicitation was not corrupt. This is plainly incorrect. *Behanna* does not stand for the proposition that the prosecution can never urge the jury to disbelieve out-of-court statements; it only says that the prosecution may not do *only* that. Miller's mistaken argument here illustrates the potential the instruction would have for confusing the jury as to when it could and could not disbelieve an out-of-court statement. Where, as in this case, there is little risk that the jury will behave in the way that *Behanna* seeks to prevent, the instruction is neither required nor appropriate.

■ Finally, Miller argues that he was entitled to an instruction that unless the jury was convinced beyond a reasonable doubt that he did not act to benefit the United States, he could not be guilty of the espionage charges. The instruction that Miller requested would have stated that he could not be convicted if his actions "were intended to benefit the United States." The instruction would also have explicitly

---

**15.** In order to prove the offense charged under 50 U.S.C. § 783(b) the government must show that the defendant knew or had reason to believe that the person to whom he gave classified information was either a representative of a foreign government or a member of a Communist organization and that the defendant knew or had reason to know that the information was classified. The statute does not even require

that the government show that the defendant acted in bad faith (i.e. with intent or reason to believe that the United States would be harmed or the Soviets helped), although it would still be a potential defense that the defendant reasonably believed that the transmission of documents *had* been authorized. The district court's instructions on this count were not an abuse of discretion.

stated that this statement would still be true "even if a person acted with a mistaken, but reasonable, belief as to the extent of his authority." We conclude that Miller was not entitled to this instruction, because it does not accurately state the law. The statute expressly states that an offense is established if the defendant intentionally performed the acts charged and did so with "intent *or reason to believe* that the [information delivered] is to be used to the injury of the United States." 18 U.S.C. §§ 793(a) [16] & 794(a) (emphasis added); *see also Gorin*, 312 U.S. at 27, 61 S.Ct. at 434. Miller's proposed instruction was defective because it ignored the fact that the statute is written in the alternative. The jury could have concluded that Miller believed that his actions would neither harm the United States nor help the Soviets and yet still have convicted him on the grounds that either (or both) beliefs were unreasonable. Indeed, even the cases cited by Miller demonstrate that the defendant's belief that his actions would help the United States must be a reasonable one. *See, e.g., United States v. Smith*, 592 F.Supp. 424, 429 & n. 2 (E.D.Va.1984), *vacated on other grounds*, 780 F.2d 1102 (4th Cir.1985) (en banc).

Although we conclude that Miller was not entitled to the instruction that he requested, we nonetheless remain troubled by the instruction that the court actually gave concerning the existence of a good faith defense. The court's instruction to the jury on this issue read, in part, as follows:

> [Y]ou may consider whether the defendant acted in good faith and reasonably believed that communication or delivery of the document specified in Count Two was within the scope of his·authorized duties as an FBI Agent and actually intended to communicate and deliver that classified document to Svetlana Ogorodnikova as part of his official duties as an FBI agent to the extent that it may bear on whether he had reason to believe that the document was to be used to the inju-

ry of the United States or to the advantage of a foreign nation.

We are troubled by this instruction because it seems to misconceive the nature of Miller's defense. Miller did not really contend that he was acting within the scope of his duties; rather, his defense was that he deliberately went outside the scope of what he was authorized to do and that he did so in order to set up an operation that he hoped would later meet with FBI approval. Thus, it would have been more appropriate to instruct the jury to the effect that Miller's reasonable belief, if any, that his actions would have met with subsequent approval from his FBI superiors could be taken into account in deciding whether he had reason to believe that his actions would harm the United States or help the Soviets.

*10. Corroboration of Miller's Admissions.*

 We review mixed questions of law and fact which are primarily factual for clear error. *United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir.), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

Miller contends that the court should not have admitted, as evidence on the bribery and non-conspiracy espionage charges, Miller's out-of-court statements that he (1) passed a classified document and (2) solicited money and gold. Miller argues that his statements were not sufficiently corroborated and that they were unreliable in view of his earlier denials, the circumstances of the interrogation, and the other evidence of unreliability that he presented. For these reasons, Miller also objects to the court's denial of his motion for acquittal on these counts under Fed.R.Crim.P. 29.

The government must introduce sufficient independent evidence that tends to establish that a defendant's admission is trustworthy. *Opper v. United States*, 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954); *United States v. Taylor*, 802 F.2d 1108, 1116–17 (9th Cir.1986), *cert. denied*,

---

**16.** Although Miller is charged under § 793(b), the intent required for conviction under § 793(b) is defined in subsection (a).

479 U.S. 1094, 107 S.Ct. 1309, 94 L.Ed.2d 164 (1987). The Supreme Court has made clear, however, that it is sufficient if the "corroboration merely fortifies the truth of the confession, without independently establishing the crime charged." *Smith v. United States*, 348 U.S. 147, 156, 75 S.Ct. 194, 199, 99 L.Ed. 192 (1954). Although all the elements "must be established by independent evidence or corroborated admissions," one method of corroboration "is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused." *Id.*

The government did not merely rely on Miller's statements. Evidence of the surrounding circumstances, as reviewed above, helped the jury to determine the trustworthiness of Miller's admissions. Although the independent evidence against Miller is not as strong as the evidence in some cases, *see, e.g., Kampiles*, 609 F.2d at 1238 (bank account showed deposit in same amount that defendant confessed receiving), sufficient evidence exists here to support the district court's admission of the evidence and to support the denial of the motion for acquittal.

### CONCLUSION

We conclude that the district court abused its discretion in admitting extensive testimony concerning the polygraph examinations that Miller failed. We also conclude that the district court improperly permitted the evidence concerning Miller's alleged bribe of Grayson to be used to establish intent for all of the charges for which Miller was tried. Lastly, we hold that the prosecution improperly invited the jury to use expert testimony as character evidence. In light of these errors, we conclude that Miller's conviction on all counts must be reversed.

The conviction is REVERSED and the case REMANDED for a new trial.